Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CLARENCE RAY ALLEN,<br>*Petitioner-Appellant,*<br><br>v.<br><br>JEANNE S. WOODFORD, Warden, of<br>the California State Prison at San<br>Quentin,<br><br>*Respondent-Appellee.* | No. 01-99011<br><br>D.C. No.<br>CV-88-01123-FCD-<br>JFM<br><br>ORDER AND<br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, District Judge, Presiding

Argued and Submitted
June 12, 2003—San Francisco, California

Filed May 6, 2004
Amended January 24, 2005

Before: Susan P. Graber, Kim McLane Wardlaw, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Wardlaw

## COUNSEL

Michael Satris, Bolinas, California, and Michael Thorman, Hayward, California, for the appellant.

Ward A. Campbell, Supervising Deputy Attorney General, Sacramento, California, for the appellee.

## ORDER

The Opinion filed on May 6, 2004 and appearing at 366 F.3d 823 (9th Cir. 2004), is amended as follows: On slip opinion page 5831 insert the following language at the end of the first paragraph:

> We do not hold that humanizing, non-exculpatory evidence can *never* be enough to establish prejudice. Rather, we simply hold that the quality and quantity of the particular evidence offered by Allen, in light of the heinous nature of his crimes, does not establish prejudice.

The mandate shall issue forthwith.

With this amendment, the panel has voted unanimously to deny the petition for rehearing and to reject the suggestion for rehearing en banc.

The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED. No subsequent petition for rehearing or rehearing en banc may be filed.

---

**OPINION**

WARDLAW, Circuit Judge:

Clarence Ray Allen appeals the denial of his petition for writ of habeas corpus by the United States District Court for the Eastern District of California. He asserts numerous claims of constitutional error in both the guilt and penalty phases of his 1982 trial for the Fran's Market triple-murder and related conspiracy to murder.

The evidence of Allen's guilt for the crimes of conviction is overwhelming. His own testimony provided perhaps the most incriminating evidence of that of the 58 witnesses who testified over 23 days during his jury trial, which ended in convictions for triple-murder and conspiracy to murder seven people, and a judgment imposing a sentence of death. Just as overwhelmingly plain, however, is that Allen's representation at the penalty phase of his trial fell below an objective standard of reasonableness. Trial counsel admits he did nothing to prepare for the penalty phase until after the guilty verdicts were rendered, and even then, in what little time was available, he failed sufficiently to investigate and adequately present available mitigating evidence.

We must decide whether, if counsel had adequately investigated, presented and explained the available mitigating evidence, there is a reasonable probability that the result of Allen's penalty phase would have been a sentence other than death. Having carefully and independently weighed the mitigating evidence, "both that which was introduced and that which was omitted or understated," *Mayfield v. Woodford*,

270 F.3d 915, 928 (9th Cir. 2001) (en banc), against the extraordinarily damaging aggravating evidence, we are compelled to conclude, as did the district court before us, that it is not reasonably probable that even one juror would have held out for a life sentence over death. Given that Allen had just been convicted by his death-qualified jury of orchestrating — from jail — a conspiracy to murder seven people, and succeeding in the actual killing of three, all to retaliate for their prior testimony against him and to prevent future damaging testimony, and that the potential evidence in mitigation was neither explanatory nor exculpatory and was provided by persons unaware of Allen's numerous horrendous crimes or who were otherwise impeachable, we must conclude that there is no reasonable probability, i.e., "a probability sufficient to undermine confidence in the outcome," *Strickland v. Washington*, 466 U.S. 668, 694 (1984), that the jury would have reached a different result. We therefore affirm.

I.   Background[1]

The "sordid events," *Allen*, 42 Cal. 3d at 1236, underlying this appeal were set in motion in June 1974, when Allen decided to burglarize Fran's Market in Fresno, California. Ultimately, Allen was convicted of the burglary and related first-degree murder of Mary Sue Kitts, the crime for which he was serving a life sentence when he committed his current crimes of conviction in an effort to silence the witnesses who testified at the 1977 Fran's Market/Kitts murder trial.

---

[1]We derive much of this recitation of facts and proceedings from that of the California Supreme Court in *People v. Allen*, 42 Cal. 3d 1222, 1236-47 (1986), and from our own independent review of the record. Many of the relevant facts are undisputed, and the California Supreme Court's factual findings are adequately supported by the record.

A.    The Fran's Market Burglary and Murder of Mary Sue
      Kitts

Allen had known the owners of Fran's Market, Ray and
Frances Schletewitz, for more than a decade. To assist in the
burglary, Allen enlisted the help of his son Roger, as well as
Carl Mayfield and Charles Jones, employees in Allen's secur-
ity guard business and frequent coconspirators in prior crimi-
nal pursuits.

On the night of the burglary, Roger Allen invited the
Schletewitz's 19-year-old son, Bryon, to an evening swim-
ming party at Allen's house. There, Bryon's keys to Fran's
Market were taken from his pants pocket while he was swim-
ming. Later in the evening, while Bryon was on a date
arranged by Allen with 17-year-old Mary Sue Kitts, son
Roger's live-in girlfriend at the time, Allen, Mayfield, and
Jones used Bryon's keys to burglarize his parents' market.
They removed a safe from the market and divided the $500
in cash and over $10,000 in money orders found inside. With
help from his son Roger, his girlfriend Shirley Doeckel, Kitts,
and two others — Barbara Carrasco and her stepson Eugene
Leland ("Lee") Furrow — Allen cashed the stolen money
orders at southern California shopping centers by using false
identifications. While the stolen money orders continued to be
cashed, Kitts contacted Bryon Schletewitz and tearfully con-
fessed to him that she had helped to cash the money orders
stolen from Fran's Market by Allen.

Bryon confronted Roger Allen with this story, and Roger
admitted that the Allen family had burglarized the store.
Bryon, in turn, confirmed to Roger that Kitts had been the one
to confess the burglary to him. When Roger told his father of
Bryon's accusation based on Kitts's confession, Allen
responded that Bryon and Kitts would have to be "dealt with."
Allen next told Ray and Frances Schletewitz that he had not
burglarized their store and that he loved Bryon like his own
son. He also threatened and intimidated the Schletewitzes,

however, by hinting that someone was planning to burn down their house and by having Roger pay Furrow $50 to fire several gunshots at their home one midnight.

Meanwhile, Allen called a meeting at his house and told Jones, Mayfield, and Furrow that Kitts had been talking too much and should be killed. Allen called for a vote on the issue of Kitts's execution. The vote was unanimous because those present feared what would happen if they did not go along with Allen's plan. Allen had previously told his criminal accomplices that he would kill snitches and that he had friends and connections to do the job for him even if he were in prison. He had also referred to himself as a Mafia hitman and stated that the "secret witness program" was useless because a good lawyer could always discover an informant's name and address. Allen kept a newspaper article about the murder of a man and woman in Nevada, and claimed he had "blown them in half" with a shotgun.

Allen thereafter developed a plan to poison Kitts by tricking her into taking cyanide capsules at a party to be held at Doeckel's Fresno apartment. Allen sent Mayfield and Furrow to get the cyanide and took some heavy stones from his house to weigh down Kitts's body, which was to be dumped into a canal. He overruled Jones's suggestion that Kitts merely be sent somewhere until "things died down," and he dismissed Doeckel's objection to having a murder committed in her apartment. Shortly before the party began, Allen told Furrow that if he refused to commit the killing, Allen could just as easily get rid of two people as one.

Allen left Doeckel's apartment shortly before Kitts arrived. When Kitts arrived and refused to take the "pills" offered to her, Mayfield and Jones called Allen. Allen told Furrow to kill her one way or another because he just wanted her dead. Later, when Kitts still would not take the cyanide pills, Allen met Furrow outside the apartment and stressed that he "didn't care how it was done but do it." Allen added that Furrow

would be killed if he tried to leave the apartment. When Furrow and Kitts were finally left alone, Furrow began to strangle Kitts, only to be interrupted by a phone call from Allen asking if he had killed her yet. When Furrow answered no, Allen ordered him to "do it" and hung up. Furrow then strangled Kitts to death. Warning Jones, Doeckel, and Furrow that they were all equally involved in the murder, Allen had them tie stones to Kitts's wrapped-up body and, while he watched for traffic, throw it into a canal.

After the murder, Allen threatened and bragged to his various cohorts. To Carrasco, Allen said of Kitts that he had had to "ride her up, wet her down and [feed] her to the fishes." When Mayfield asked how Furrow was doing, Allen responded that he was "no longer in existence," explaining that it is easy to go to Mexico, get someone killed, and have the body disposed of for only $50. Allen also told Shirley Doeckel that Furrow was no longer around and repeated his claim that he had killed a woman in Las Vegas. Allen had not actually killed Furrow, however, and would later enlist his help in the 1974 robbery of an elderly couple at their jewelry store. About six months after the murder, when Mayfield asked Allen if he was worried about others talking, Allen said that he was not afraid, that "things would be taken care of" if that happened, that he would have snitches killed, and that he would take care of "secret witness" informers even if he were imprisoned.

Allen told Jones and others that "talking was a spreading disease and that the only way to kill it was to kill the person talking." Allen would say of his cohorts that "none of [these] people talked" and that, if they did, "he would get them from inside or outside prison." When Jones's home was burglarized some time after the murder and Jones told Allen about the burglary, Allen responded that the burglary showed how easily Jones could be reached. Allen later gave Jones a key that fit his residence, and told him in front of his five-year-old son

that he knew Jones "would like his kids to grow up without harm."

Allen later brought in new employees, Allen Robinson and Benjamin Meyer, and bragged to Meyer that he "had a broad helping them who got mouthy so they had to waste her" and that she "sleeps with the fishes." He further warned Meyer, "If you bring anybody in my house that snitches on me or my family, I'll waste them. There's no rock, bush, nothing, he could hide behind." When Meyer asked what would happen if Allen was arrested and could not make bail, Allen replied, "You've heard of the long arm of the law before? Well don't underestimate the long arm of this Indian. I will reach out and waste you."

After holding meetings with his new employees and his son Roger, Allen arranged for the group to rob a K-Mart store in Tulare. Chastising Robinson for making mistakes, Allen told Meyer, "We just might waste him," and later replaced Robinson with Larry Green as his "inside man." During an armed robbery of a Visalia K-Mart in March 1977, Green shot a bystander, and police arrested him along with Meyer and Allen. Allen was tried and convicted in 1977 of robbery, attempted robbery, and assault with a deadly weapon. His arrest also led to his second 1977 trial, for the Fran's Market burglary, conspiracy, and the murder of Mary Sue Kitts. Numerous witnesses, including Bryon Schletewitz, Mayfield, Jones, Furrow, Doeckel, Carrasco, and Meyer, testified on behalf of the prosecution. Allen was convicted of burglary, conspiracy, and the first-degree murder of Kitts, and was sentenced to life in prison with the possibility of parole.

B.   The  Fran's  Market  Triple-Murder  and  Witness Retaliation Scheme

While incarcerated at Folsom Prison, Allen called and wrote his second son, Kenneth, to request several copies of a magazine article about Kitts's murder. He explained that he

wanted to send the copies to other prisons to solicit help retaliating against those who had testified against him.

In Folsom, Allen met Billy Ray Hamilton, a fellow inmate and convicted robber who was housed nearby and worked with Allen in the prison's kitchen for two months in mid-1980. Hamilton, nicknamed "Country," became Allen's "dog," running errands and taking care of various problems in return for cash. Another inmate, Gary Brady, would occasionally assist Hamilton. Brady was scheduled to be paroled on July 28, 1980; Hamilton was scheduled for parole one month later.

After Hamilton and Brady had been helping him for some time, Allen informed them that he had an appeal coming up and wanted certain people taken "out of the box, killed," because "they had been onto his appeal," and "messed him around on a beef." Allen mentioned the names "Bryant" (Bryon), Charles Jones, and "Sharlene" as witnesses to be killed, and offered Hamilton $25,000 for the job. Allen also confided to another inmate, Joseph Rainier, that he had been convicted of first-degree murder based on the testimony of "the guy who did the actual killing" and that he would like to see this person, as well as four other witnesses, killed. Rainier saw Allen and Hamilton huddled close together and talking on the prison yard bleachers and track every day for the four to six weeks before Hamilton's release in late August 1980. In response to Rainier's repeated inquiries about what was going on, Allen stated that Hamilton was "going to take care of some rats for [him]." Allen later elaborated that Hamilton was going to "get paid for the job" and that "Kenny was going to take care of transportation." Allen said that he could likely "win his appeal" if the witnesses were killed and offered to have witnesses who had testified against Rainier killed as well.

Allen asked his eldest son Kenneth, and Kenneth's wife Kathy to visit him in jail, which they did with their baby on

August 15. Allen told Kenneth that both Ray and Bryon Schletewitz were going to be murdered and that the other witnesses against him would also be eliminated so that he would prevail on retrial if he won his appeal. He added that Shirley Doeckel had agreed to change her testimony if he were granted a new trial. Allen gave Hamilton's mug shot to Kenneth and explained that Hamilton — whom he referred to as "Country" — would commit the killings and that he expected Kenneth to supply "Country" with guns and transportation. Kenneth agreed to find guns for Hamilton with Kathy's help, and Kenneth smuggled Hamilton's photo out of prison in his baby's diaper. He and Kathy thereafter received a series of letters from Allen detailing the evolving plans.

Soon after Hamilton was paroled, Kenneth wired him transportation money and met him at the Fresno bus depot. At Kenneth's house, Hamilton confirmed that he was there to murder Bryon and Ray Schletewitz, and asked to see the weapons he would be using. He explained that he would not kill Doeckel yet because she was helping him locate the other hit-list witnesses. Hamilton's girlfriend, Connie Barbo, joined Hamilton in Fresno. She told acquaintances that she had a chance to get a few thousand dollars and a hundred dollars worth of "crank" for "snuffing out a life."

On Thursday, September 4, Hamilton went to Kenneth's house to get a sawed-off shotgun, a .32 caliber revolver, and seven shotgun shells from Kenneth. Hamilton discussed Fran's Market, stating that he knew there were two safes there, one in the wall and the other in the freezer. He left that evening with Barbo, telling Kenneth he was going to murder Ray and Bryon Schletewitz. The two returned at about 9:45 p.m., however, explaining that they had aborted the execution because Barbo objected to killing a 15-year-old Mexican boy who was also in the store that night.

The next evening Hamilton took thirteen additional shotgun shells and six more cartridges from Kenneth, and went with

Barbo back to Fran's Market. When they arrived at 8 p.m., just before closing time, Bryon Schletewitz and employees Douglas Scott White, Josephine Rocha, and Joe Rios were there. Shortly after entering, Hamilton brandished the sawed-off shotgun and Barbo produced the .32 caliber revolver. Hamilton led White, Rocha, Rios, and Bryon toward the stockroom and ordered them to lie on the floor. He told White to get up and walk to the freezer, warning White he knew there was a safe inside. When White told Hamilton there was no safe there, Hamilton responded, "Get out 'Briant.'" Bryon Schletewitz then volunteered, "I am Bryon." Following Hamilton's demand, Bryon gave up his keys and assured Hamilton he would give him all the money he wanted.

While Barbo guarded the other employees, Bryon led Hamilton to the stockroom where, from seven to twelve inches away, Hamilton fatally shot him in the center of his forehead with the sawed-off shotgun. Hamilton emerged from the stockroom and asked White, "Okay, big boy, where's the safe?" As White responded, "Honest, there's no safe," Hamilton fatally shot him in the neck and chest at point-blank range. As Josephine Rocha began crying, Hamilton fatally shot her through the heart, lung, and stomach from five to eight feet away. Meanwhile, Joe Rios had escaped to the women's restroom. Hamilton found him, opened the restroom door, pointed the shotgun at Rios' face, and shot him from three feet away. Rios, however, had put his arm up in time to take the blast in the elbow, saving his life. Assuming that Rios was dead, Hamilton and Barbo fled the store, only to be spotted by neighbor Jack Abbott, who had come to investigate after hearing the shots. Barbo retreated back into the store's restroom, and Hamilton and Abbott traded fire. Although hit, Abbott managed to shoot Hamilton in the foot as he ran to his getaway car. Barbo was apprehended by officers at the scene.

Hamilton called Kenneth later that evening, saying he had "lost his kitten" and "things went wrong at the store." The two met and exchanged cars. Hamilton next drove to the Modesto

home of Gary Brady, the Folsom inmate who had been paroled one month before Hamilton. While staying with Brady, Hamilton told him he had "done robbery" and had "killed three people for Ray." He had Brady's wife write to Allen requesting the money he was owed for the job. The letter, signed "Country," gave Brady's Modesto address as the return address. Shortly thereafter, police arrested Hamilton for robbing a liquor store across the street from Brady's apartment. The police seized from Hamilton an address book containing a list of names and addresses of the eight people who had testified against Allen at the 1977 Kitts murder trial — Lee Furrow, Barbara Carrasco, Benjamin Meyer, Charles Jones, Carl Mayfield, Shirley Doeckel, and Ray and Bryon Schletewitz. When investigators visited Kenneth Allen's home, Kathy Allen gave them Hamilton's mug shot.

After an article about the Fran's Market triple-murder appeared in the newspaper, Allen asked fellow inmate Rainier, "Why don't you testify against me . . . and see if you can help yourself or get some time off?" When Rainier responded that he could not do that, Allen patted him on the back and said, "You wouldn't want to do that anyway because you do have a lovely daughter."

Shortly after the Fran's Market murders, Kenneth was arrested on drug charges. The police interviewed Kenneth about the murders. A week later, he contacted the police to offer his testimony in return for protective custody and his choice of prisons. He eventually entered into a plea agreement in which he promised to testify "truthfully and completely" in all proceedings against Hamilton, Barbo, and Allen. In June 1981, Allen was charged in the Fran's Market triple-murder and underlying conspiracy. Kenneth testified at Allen's preliminary hearing.

C. Allen's 1982 Trial for the Fran's Market Triple-Murder and Conspiracy

Allen was charged with murdering Bryon Schletewitz (count one), Douglas Scott White (count two), and Josephine

Rocha (count three), and conspiring to murder Bryon Schlete-witz, Ray Schletewitz, Lee Furrow, Barbara Carrasco, Benja-min Meyer, Charles Jones, and Carl Mayfield (count four). The information further alleged eleven special circumstances: five under count one, three under count two, and three under count three.

The jury heard from 58 witnesses over the 23-day guilt phase of Allen's trial. Although the prosecutor terminated Kenneth's plea agreement after discovering Kenneth had writ-ten to Allen promising to change his testimony at trial, Ken-neth, stating he wanted to testify truthfully, and having been fully advised of his rights and the fact that the previous plea agreement was terminated, testified for the prosecution.

In addition, Allen took the stand in his own defense. He denied any involvement in the Fran's Market murders or in the conspiracy to execute the witnesses who testified against him in his previous trial; however, he admitted on cross-examination that he had told his "good dog" Hamilton to go to Fresno, and that he wrote all of the letters received into evi-dence and conceded they referred to Hamilton's impending visit to Fresno. Allen confirmed that parts of those letters referred to Meyer, Mayfield, and Jones, and that a phrase he had used — "taken care of" — meant "to kill." He also acknowledged that he had access to mug shots in Folsom Prison, and admitted talking to Hamilton in the bleachers at the prison. After being confronted with a tape recording, he admitted ordering Kathy Allen to call the Schletewitzes to impersonate Mary Sue Kitts, and to pretend to be the mother of Bryon's baby so as to induce the family to call off the Kitts murder investigation.

Allen's testimony also confirmed many of the details about his former criminal activities and convictions about which Jones, Mayfield, Furrow, Meyer, Doeckel, and Carrasco had all testified. He denied planning the Kitts murder, but described how he had helped transport and dispose of her

body. He also described in great detail his formula for executing "fool-proof" armed robberies of various K-Mart stores, and described in detail his role in the Tulare K-Mart robbery. Finally, Allen maintained that "when a guy puts a rat jacket on himself [i.e., becomes a snitch], killing them would do them a favor."

Allen's daughter-in-law, Kathy, tried to exculpate Allen and implicate her husband, Kenneth, as the drug-crazed, hallucinogenic mastermind of the Fran's Market murders. She recalled, however, that Kenneth had discussed getting "guns for witnesses" with his father at Folsom and that Barbo had told her that she and Hamilton could not leave any witnesses. Kathy admitted that she had previously testified for Allen, had tried to falsify evidence about the murders, and had transmitted messages to Hamilton for Allen.

Three prison inmate witnesses, John Frazier, Henry Borbon, and Andrew Thompson testified that Hamilton, Allen, and Brady could not have met together in the Folsom yard. Thompson nevertheless admitted that he called Allen "Dad" and would lie to protect him. Borbon's testimony was impeached by that of other witnesses.

After three days of deliberation, on August 22, 1982, the jury found Allen guilty as charged. Allen then admitted that he had previously been convicted of murder, confirming three of the eleven special circumstance allegations that had been bifurcated from the trial pursuant to California Penal Code § 190.1(b).

Eight days later, the penalty phase began. The State's evidence showed that Allen had masterminded eight prior armed robberies: (1) the August 12, 1974, armed robbery at Safina Jewelry in Fresno, which yielded $18,000 worth of jewelry; (2) the September 4, 1974, armed robbery of Don's Hillside Inn in Porterville in which $3,600 was taken from the safe and hundreds of dollars in cash and credit cards were taken from

patrons at the scene; (3) the February 12, 1975, residential armed robbery of William and Ruth Cross, an elderly Fresno couple, in which a coin collection valued at $100,000 was taken; (4) the June 18, 1975, attempted robbery at Wickes Forest Products in Fresno, resulting in Allen's arrest; (5) the October 21, 1976, armed robbery at Skagg's Drug Store in Bakersfield, in which one of Allen's associates accidentally shot himself; (6) the November 20, 1976, armed robbery at a Sacramento Lucky's market, in which grocery clerk Lee McBride was shot and sustained permanent damage to his nervous system; (7) the February 10, 1977, robbery at a Tulare K-Mart, in which more than $16,000 in cash was taken; and (8) the March 16, 1977, Visalia K-Mart robbery, during which Larry Green held a gun to the head of one employee and shot another in the chest, permanently disabling him.

Prosecution evidence also showed that while in the Fresno County jail on June 27, 1981, Allen called a "death penalty" vote for inmate Glenn Bell, an accused child molester. According to the evidence, Allen directed an attack during which inmates scalded Bell with two gallons of hot water, tied him to the cell bars and beat him about the head and face, and thereafter shot him with a zip gun and threw razor blades and excrement at him while he huddled in his blanket in the corner of the cell.

The evidence also established that Allen repeatedly threatened that anyone who "snitched" on the Allen gang would be "blown away" or killed. Allen had also thwarted prosecution of the attempted robbery at Wickes Forest Products by threatening the chief prosecution witness and his family.

Allen's prior convictions of (1) conspiracy, first-degree murder, first-degree burglary, and (2) first-degree robbery, attempted robbery, and assault with a deadly weapon were introduced. The parties also stipulated to the consideration by the jury of the guilt-phase testimony by Ray Schletewitz,

Mayfield, Jones, Furrow, and Meyer concerning (1) the prior conspiracy to murder and the first degree murder of Kitts; (2) the 1974 robbery at the Safina Jewelry Store; (3) the 1977 burglary and robbery of the Tulare K-Mart; and (4) the 1977 assault with a deadly weapon, burglary, conspiracy to commit robbery, and attempted robbery of the Visalia K-Mart.

Allen put on two witnesses. His former girlfriend, Diane Appleton Harris, testified to his good character, explaining that Allen had helped her financially both before and after her marriage to Jerry Harris. Harris further testified that Allen had helped rush her to the hospital on one occasion, that he was good to children, and that he wrote poetry. But, Harris admitted that Allen had also threatened to kill her husband.

The second witness, San Quentin inmate John Plemons, testified that he had instigated the assault on accused child molester Glenn Bell in the Fresno County jail, and that Allen had nothing to do with it. Plemons's testimony was rebutted by Correctional Officer Delma Graves, who testified that Bell told her immediately after the incident that Allen had instigated the assault.

After deliberating for less than one day, the jury returned a verdict of death. The trial court denied Allen's "statutory motion for a new trial" and sentenced him to death.

D. Appellate and Habeas Proceedings

The California Supreme Court affirmed Allen's conviction and sentence on December 31, 1986, *Allen*, 42 Cal. 3d at 1222, and summarily denied his December 1987 and March 1988 supplemental habeas petitions. Allen filed a federal habeas petition on August 31, 1988, and moved for an evidentiary hearing. The district court then stayed the proceedings for exhaustion of all claims.

The district court reopened Allen's federal habeas proceedings in September 1993. Allen moved for an evidentiary hear-

ing, which was granted in part. In April 1997, the magistrate judge presided over a six-day evidentiary hearing on the issue of ineffective assistance of counsel in the penalty phase. On March 9, 1999, the magistrate judge issued Findings and Recommendations denying Allen's habeas petition. Following objections to the magistrate judge's Findings and Recommendations, the district court conducted a de novo review of the case in compliance with 28 U.S.C. § 636(b)(1)(C), holding argument on April 26, 2001. On May 11, 2001, the district court issued a Memorandum and Order adopting in full the magistrate judge's Findings and Recommendations and denying Allen's petition. Allen timely filed a notice of appeal and, on July 5, 2001, the district court issued a Certificate of Appealability, certifying both guilt- and penalty-related issues.

## II. Jurisdiction and Standard of Review

We review Allen's pre-AEDPA petition de novo. "In particular, claims alleging ineffective assistance of counsel are mixed questions of law and fact and are reviewed de novo." *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir.), *cert. denied*, 537 U.S. 942 (2002). We review the district court's findings of fact for clear error, present only where we have a " 'definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000)). "Although less deference to state court factual findings is required under the pre-AEDPA law which governs this case, such factual findings are nonetheless entitled to a presumption of correctness unless they are 'not fairly supported by the record.' " *Id.* at 835 (citing 28 U.S.C. § 2254(d)(8) (1996)). Thus, we owe the state court's factual findings less deference here than in a case governed by AEDPA; however, such factual findings are entitled to a presumption of correctness as long as they are fairly supported by the record. *Id.*

III.  Guilt-Phase Claims

[1] Allen collaterally challenges his conviction on numerous grounds. As explained below, however, to the extent that any claim of error in the guilt phase might be meritorious, we would reject that error as harmless because the evidence of Allen's guilt is overwhelming. Because of the compelling nature of the guilt-phase evidence, for purposes of decision, we address the evidence of guilt before turning to Allen's claims of trial error.

A.  Evidence of Allen's Guilt

Allen's own son Kenneth directly tied Allen to the Fran's Market triple-murder and conspiracy, testifying as to Allen's plotting and recruiting of Hamilton, Kathy, and himself. Brady corroborated Kenneth's testimony, explaining that Allen attempted to recruit both Hamilton and Brady to kill those who had testified against Allen, and describing how he housed Hamilton immediately after the triple-murder.

Extensive evidence corroborated Kenneth's and Brady's testimony and supported the jury's guilty verdict. Joe Rainier testified that Allen told him Hamilton was going to take care of "some rats" for him, that Hamilton would be paid for the job and that "Kenny [would] take care of transportation." Rainier also testified that he saw Allen and Hamilton talking together in the prison yard every day for the four to six weeks preceding Hamilton's release. Even Kathy Allen, one of Allen's biggest supporters, testified that when she and Kenneth visited Allen, she heard Allen mention "guns for witnesses." In addition, the police found the list of witnesses against Allen in Hamilton's possession and a mug shot of Hamilton — to which Allen had access in prison — in Kenneth and Kathy's home.

Most damning of all, though, was the evidence that came directly from Allen. He admitted writing letters to Kenneth

and Kathy about "Country" Hamilton coming to town. In those letters, Allen implied or spoke directly about the harm he hoped would befall the witnesses against him. On August 26, 1980, for example, Allen wrote "Hey, I hear a 'country' music show is coming to 'town' around September 3rd." Kenneth testified that "show" meant murder. The letter went on, " 'Remember' September 3? Around that date ya all plan on listening to a lot of good ol' 'country' music, okay? Just for me. You know how I like 'country.' " The following day, Allen wrote another letter, entitled, "Happy days ahead." This letter stated, "Now remember around September 3rd, have everything ready so ya all can go to that 'country' music show. I know ya all really 'enjoy yourselves.' I know you kids never liked 'country' music before, but I bet when you hear that dude on lead guitar, you will be listening to it at least once a week. Ha-ha." Allen further asked Kenneth to "give his best" to Carl Mayfield: "Tell him I am thinking of him and I hope to see him one day, but I am sure he knows that already."

Allen also called Shirley Doeckel a "snitch bitch" and wished her "many, many more" problems. He wrote of "his dog," Hamilton, leaving Folsom and wanting to find and meet "Chuckettea" (a.k.a. Chuck Jones). Allen also wrote that Hamilton wanted to meet "Mr. Jones and Mr. Mayfield and a few other good friends" and that "he might move out close to Raisin City," home of Ben Meyer. Allen further admitted asking Hamilton to go see Kenneth and Kathy in Fresno; at first he claimed that he had merely asked Hamilton to visit his children and grandchildren, but he eventually admitted that Hamilton was to unload a "hot gun" from Kenneth and Kathy. The jury was also able to examine several of Allen's poems, some of which emoted over and identified with the life of a contract hit man, including the following "Allen Gang" poem:

> Ray and his sons are known as the Allen Gang.
> Sometimes you have often read

how we rob and steal and for those who squeal
are usually found dying or dead.

The road gets slimmer and slimmer
and at times it is hard to see,
but we stand like a man
robbing every place we can,
because we know we'll never be free.

Someday it will be over
and they will bury us side by side.
To some it will be grief,
but to us it's relief
knowing we finally found a safe place to hide.

Allen's testimony was fraught with damaging inconsistencies and implausible explanations. He admitted lying and telling his associates that Lee Furrow had been killed in Mexico. He implausibly asserted that he had not directed or been involved in killing Mary Sue Kitts, but that he had only "assisted in the disposal of her body." Allen also testified that he "barely even knew . . . Billy Ray Hamilton" and that he only "talked to him maybe three or four times," although he referred to Hamilton numerous times as "his good dog" (which, as he testified, meant "close acquaintance") in his letters to Kenneth and Kathy. Allen testified inconsistently as to whether he went to San Diego to cash money orders stolen from Fran's Market and whether the Schletewitzes had come to his house to pressure him to pay money that he owed them. After having his memory refreshed by a tape recording, Allen also admitted lying about having had Kathy Allen "call the Schletewitzes and act as if she were Mary Sue Kitts." Questioned repeatedly about the inmate photos in his cell, Allen finally asserted that he was "planning on writing a book about twelve convicts that [he] got acquainted with in Folsom." Allen further testified about much of his prior criminal history, including his knowing solicitation of someone — Larry Green — that he considered to be "a very dangerous man"

and knew "might kill somebody" to commit burglaries. Finally, Allen provided illuminating testimony regarding his hatred of snitches. Among many other statements, Allen explained: "[W]hen a guy puts a rat jacket on himself, killing them would do them a favor."

## B.  Guilt-Phase Claims

None of Allen's claims has merit. Even if we were to find any of his claims meritorious, we would not find that such error "had a substantial and injurious effect on the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993) (internal quotation marks omitted). Therefore, we address each only briefly.

### 1.  State's Alleged Reliance on False Testimony

Allen claims that the State's reliance on false testimony to establish and maintain his conviction entitles him to relief.

> '[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have [a]ffected the judgment of the jury.'

*United States v. Young*, 17 F.3d 1201, 1203 (9th Cir. 1994) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Premised upon Kenneth Allen's recantation after judgment and Gary Brady's alleged perjury, this claim falls of its own weight.

### a.  Kenneth Allen's Recantation

**[2]** Kenneth Allen's later recantation of his trial testimony does not render his earlier testimony false. *See Dobbert v. Wainwright*, 468 U.S. 1231, 1233 (1984) (Brennan, J., dissenting from denial of certiorari) ("Recantation testimony is

properly viewed with great suspicion."); *see also Carriger v. Stewart*, 132 F.3d 463, 483 (9th Cir. 1997) (en banc) (Kozinski, J., dissenting) ("Appellate courts . . . look upon recantations with extreme suspicion."); 58 Am. Jur., New Trial § 345 ("recantation testimony is generally considered exceedingly unreliable"). Here, Kenneth's recantation testimony is even more unreliable because his trial testimony implicating Allen is consistent with the other evidence, while his recantation is not. For example, Kenneth now denies that he discussed killing witnesses with Allen during their visit at Folsom Prison on August 15, 1980. At Allen's trial, however, Kenneth's estranged wife Kathy, who testified on Allen's behalf and admitted trying to fabricate evidence to exculpate Allen, testified that she overheard Kenneth and Allen discussing "getting guns for witnesses" at that Folsom Prison meeting. Kenneth now also claims that Allen only sent Hamilton to Kenneth's house to give Hamilton an opportunity to look for a job. Allen testified at trial, however, that Allen sent Hamilton to Fresno to help Kenneth dispose of a "hot" gun and that Hamilton was only stopping in Fresno on his way to San Diego.

Kenneth's recantation also conflicts with all the other evidence pointing to Allen's involvement in planning the murders. For example, there are contradictions between Kenneth's recantation and: (1) Allen's numerous letters to Kenneth reminding him of Hamilton's visit to Fresno; (2) the list of witnesses from Allen's first trial found on Hamilton when he was arrested; and (3) Kenneth's possession of a mug shot of Hamilton. No reasonable juror could find the current story credible when it is only Kenneth's trial testimony that makes sense in light of all the other evidence. Moreover, Allen asserts no evidence, even assuming that Kenneth's trial testimony was false, that the State "knew, or should have known" that it was false. *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) ("It is a prosecutor's duty to refrain from knowingly presenting perjured testimony . . . .") (internal quotation marks omitted).

### b. Gary Brady

Although Allen points out minor inconsistencies in Brady's testimony at pretrial proceedings, at Allen's trial, at another trial, and at Brady's deposition, Allen fails to establish that Brady's testimony at Allen's trial was untruthful. Indeed, Brady has testified consistently as to the material facts. In *People v. Marshall*, for example, Brady testified that Allen asked Brady and Hamilton to kill some people who had testified against him. 13 Cal. 4th 799 (1996). Then in his deposition, Brady again confirmed that Allen offered to pay Brady and Hamilton for killing the witnesses to the former proceeding.

Brady's trial testimony was also subjected to substantial impeaching evidence, such as Brady's substance abuse problem, prior felony convictions, blackouts, agreements with prosecutors by which charges were dropped against Brady and his wife in exchange for Brady's testimony, and his admission to the witness protection program. Inconsistencies between Brady's direct testimony at trial and his preliminary hearing testimony were also pointed out to the jury.

Allen fails to establish either that Brady's testimony was false or that the State had any reason to believe it was false.

### 2. Coerced Testimony of Kenneth Allen

**[3]** We reject Allen's argument that the prosecutor "coerced" Kenneth's testimony, and that such "coercion" entitles him to relief. Allen argues that the terms of the State's bargain with Kenneth Allen, and its withdrawal of that bargain, led Kenneth to adhere to the testimony he gave at the preliminary hearing, rather than tell the truth. This claim fails because the plea agreement was proper, the jury was fully informed, and the agreement had been withdrawn before Kenneth testified.

An agreement that requires a witness to testify truthfully in exchange for a plea is proper so long as "the jury is informed

of the exact nature of the agreement, defense counsel is permitted to cross-examine the accomplice about the agreement, and the jury is instructed to weigh the accomplice's testimony with care." *United States v. Yarbrough*, 852 F.2d 1522, 1537 (9th Cir. 1988). Here, the jury was thoroughly informed, through direct and cross-examination, of the plea agreement, Kenneth's subsequent letter, the prosecutor's withdrawal of the plea offer, and Kenneth's belief that it remained valid. The jury was also instructed to view accomplice testimony with "distrust" and to credit it only if corroborated. Moreover, Allen has presented no evidence supporting a finding of coercion by the State.

### 3.  Jury Instruction — CALJIC No. 2.11.5

The trial court instructed the jury pursuant to CALJIC No. 2.11.5 that it "must not discuss or give any consideration as to why the other person or persons are not being prosecuted in this trial or whether they have been or will be prosecuted." Allen claims that this instruction directed the jury not to consider whether Kenneth and Kathy Allen might be tried for the crimes and hence precluded it from considering whether Kenneth testified to protect his wife and himself from prosecution.

**[4]** A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). Even if the trial court was mistaken to give this instruction, any mistake was cured by the instructions read as a whole. *See infra* p. 1003. Here, the jury was specifically instructed regarding witness bias, interest, or other motive. It was also instructed that Kenneth was an accomplice whose testimony should be viewed with distrust, examined with care and caution, and corroborated. In light of the trial court's instructions read as a whole, there is no reasonable likelihood that the jury understood CALJIC No. 2.11.5 to bar consideration of Kenneth's motives for testify-

ing. *See People v. Fauber*, 2 Cal. 4th 792, 863 (1992) (giving CALJIC No. 2.11.5 was harmless error given the totality of the instructions).

### 4. Prosecutorial Misconduct

Allen contends that various incidents of prosecutorial misconduct rendered his trial fundamentally unfair. To the extent his claims of prosecutorial misconduct are not barred or factually or legally deficient, they do not constitute error of such degree as to have substantially and injuriously affected the verdict.

### a. Due Process Right to Immunization of Defense Witnesses

Allen asserts a due process right to judicial immunity for his defense witnesses, independent of prosecutorial misconduct. This assertion is a "new constitutional rule[ ] of criminal procedure," which is barred by *Teague v. Lane*. 489 U.S. 288 (1989). New constitutional rules of criminal procedure are inapplicable to "cases which have become final before the new rules are announced." *Id.* at 310.

When Allen's conviction became final on October 5, 1987, only one court had recognized judicially conferred immunity in select circumstances. *See Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980). The remedy Allen seeks was thus hardly compelled by precedent. *See United States v. Lord*, 711 F.2d 887, 891 n.2 (9th Cir. 1983) (expressly declining to reach the merits of *Virgin Islands*' concept of judicially conferred immunity); *People v. Hunter*, 49 Cal. 3d 957, 974 (1989) (recognizing *Virgin Islands* as "the one case which has clearly recognized [judicially conferred immunity]").

### b. Selective Immunization of Witnesses

**[5]** There is no evidence to support Allen's claim that the prosecutor selectively granted immunity. Allen argues the

prosecutor had no good reason to deny immunity to Billy Ray Hamilton, whose conviction and death sentence were on appeal at the time, or to Connie Barbo. Allen has not demonstrated that the prosecutor intentionally distorted the judicial fact-finding process by denying immunity to a potential witness whose testimony would have been relevant to the defense. *Lord*, 711 F.2d at 890-91. Allen presented no evidence that the prosecutor's denial of immunity to Barbo or Hamilton was motivated by a desire to distort the fact-finding process. Moreover, Allen fails to show how either Barbo's or Hamilton's testimony would have exculpated him.

### c. Failure to Disclose Exculpatory Information

**[6]** The State did not violate *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose evidence that would have impeached the credibility of both Brady and Kenneth. Specifically, Allen claims the prosecutor failed to disclose (1) Brady's cooperation with authorities and testimony in *People v. Marshall*, 13 Cal. 4th 799 (1996), a case similar to Allen's; (2) information about Brady's previous insanity finding and Brady's early case-related conversations with authorities; and (3) the existence of a letter written by Kenneth's wife Kathy, instructing Kenneth how to change his testimony at Hamilton's trial.

The constitutional guarantee of due process imposes upon the State the affirmative duty to disclose exculpatory information. *Brady*, 373 U.S. at 87. The failure to disclose this information "amounts to a constitutional violation only if it deprives the defendant of a fair trial," and requires reversal "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985). The testimony of Brady and Kenneth was substantially impeached. The jury heard about Brady's substance abuse problem, numerous prior felony convictions, blackouts, agreements dropping charges against Brady and his wife in exchange for

his testimony, and his placement in the witness protection program. The jury was also fully apprised of Kenneth's failed plea bargain and inconsistent statements. The additional impeachment evidence identified by Allen is simply cumulative of other impeachment evidence.

### d.    Misconduct in Closing Argument

**[7]** Although some of the prosecutor's comments during closing argument were improper, none of them, considered separately or cumulatively, prejudiced Allen. Improper prosecutorial argument violates rights under the federal constitution if it " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). It "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id.* (internal quotation marks omitted).

The prosecutor's comments regarding Allen's courtroom demeanor were permissible because Allen chose to testify. *See United States v. Schuler*, 813 F.2d 978, 981 n.3 (9th Cir. 1987) ("When a defendant chooses to testify, a jury must necessarily consider the credibility of the defendant. In this circumstance, courtroom demeanor has been allowed as one factor to be taken into consideration.").

The prosecutor's description of what Allen's victims would say from beyond the grave did not deny Allen due process because it was intended to summarize the evidence presented. *See Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (holding that prosecutor's creation of a fictitious character based on the dead victim and delivering closing argument in the voice of that character is not a denial of due process because his statements were supported by the evidence and reasonable inferences therefrom).

Finally, however, the prosecutor's suggestion that Allen and his counsel conspired to retaliate against witness Joseph

Rainier was misconduct. However, given the trial court's instruction that statements by counsel were not evidence, and given the weight of the evidence against him, the prosecutor's comments did not deprive Allen of a fair trial.

### 5. Ineffective Assistance of Counsel in the Guilt Phase

Allen's claims of ineffective assistance of counsel fail either because counsel did not act deficiently or because counsel's actions did not prejudice him. Two requirements must be met to establish a claim of ineffective assistance of counsel. First, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The proper inquiry under this prong is whether counsel's performance was "reasonable[ ] under prevailing professional norms." *Id.* at 688. However, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Second, "the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. Therefore, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

### a. Failure to Seek Second Counsel

[8] Although use of second counsel in defending capital cases is now recommended by the American Bar Association,

this recommendation did not go into effect until 1985. ABA Standards for Criminal Justice 5-6.1 (3d ed. 1992). Thus, use of second counsel was not the prevailing standard at the time of Allen's trial in 1982. Moreover, "[t]rial counsel cannot be said to be constitutionally ineffective for deciding not to bring in co-counsel, unless there is some reason . . . why the first lawyer is unable to provide adequate representation." *Pitsonbarger v. Gramley*, 141 F.3d 728, 738 (7th Cir. 1998). The record does not demonstrate that counsel was or should have been aware at the outset that he could not try this capital case on his own. While it might have been wise to seek second counsel, his failure to do so did not constitute deficient performance.

b. Opening Statement

**[9]** Counsel's opening statement contained promises of the production of certain evidence and witnesses ultimately left unfulfilled at trial, and opened with a recitation of Allen's "Hit Man" poem:

> I am a contract man, some people say,
> Dusting off people for those who pay,
> Waiting in a room to get a call,
> Knowing when it comes someone will fall.
> Some people say I'm cold and mean,
> Wasting someone I've never seen.
> But filling a contract comes real high,
> I give no thought for who will die.
> I travel a lot, always alone,
> Not knowing the feeling of having a home.
> Of all the people I've blown away,
> I've never heard one of them pray.
> I know one day the time will come,
> I'll be blown away by a contract's gun.

Counsel's decision to introduce Allen's "Hit Man" poem during the opening statement was a strategic decision, intended

to preempt the State from obtaining the most damaging use of a poem that would inevitably be introduced. Because counsel's strategic choice is presumed sound, counsel's performance was not deficient. *See Strickland*, 466 U.S. at 689. Moreover, even if counsel's conduct was arguably deficient, in light of the overwhelming evidence of guilt, Allen cannot establish prejudice.

### c. Failure to Impeach Prosecution Witnesses

Nor was the impeachment of Kenneth and Brady deficient or prejudicial. With respect to Brady, counsel elicited a host of impeachment evidence, including Brady's drug and alcohol use, memory loss, cooperation with law enforcement, and discrepancies between his trial testimony and his previous statements. Counsel similarly introduced evidence of Kenneth's drug use and conflicting stories to the police about the triple-murder, as well as testimony contradicting Kenneth's claim that he never announced an intention to kill the witnesses against his father. Not only was counsel's impeachment of Brady and Kenneth adequate, but any failure to elicit additional evidence was inconsequential, especially in light of the evidence of guilt.

### d. Failure to Call Witnesses

**[10]** Counsel's decision not to call inmate Michael Brooks, several prison employees, Barbo, and Hamilton as witnesses was a strategic decision, not deficient performance as Allen asserts. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Moreover, Allen must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). Brooks and the prison employees would have testified that Allen was a loner and was not generally seen with Brady and Hamilton. Such testimony, however, was belied by the testimony of Kenneth,

Brady, and Rainier, as well as by Allen's own letters referring to Hamilton as his "good dog." Barbo would simply have testified that she was unaware of Allen's involvement, which would have been little assistance to the defense. Further, the statements given by Hamilton, which Allen contends should have been admitted, actually implicate Allen. Therefore, Allen has not overcome the presumption that counsel's trial strategy was sound. *Id.*

e.    Failure to Introduce Other Exonerating Evidence

Similarly, counsel's decision against introducing evidence suggesting that the Fran's Market triple-murder resulted from a botched robbery attempt was a strategic decision, not deficient performance as Allen suggests. Doing so could not have effectively countered the evidence demonstrating that the murders were planned. Although emphasis on shifting the blame from Allen to Kenneth and Kathy may have been wise, counsel's strategic decision not to do so is at least presumed sound, *Strickland*, 466 U.S. at 689, and Allen has not overcome that presumption.

f.    Allen's Testimony and Closing Argument

**[11]** We reject Allen's claim that counsel's decision to put Allen on the stand was deficient. Given the overwhelming evidence of guilt introduced by the State, counsel may have reasonably believed that placing Allen on the stand was the only way to potentially rebut much of this evidence. Allen adamantly testified that he was not part of any conspiracy to commit murder. This testimony could come from no one but Allen. Moreover, at the time, counsel could not have predicted just how damaging placing Allen on the stand would be. Thus, counsel's strategic choice is presumed sound. *Strickland*, 466 U.S. at 689.

Allen cites *Johnson v. Baldwin*, 114 F.3d 835, 838 (9th Cir. 1997), for the proposition that counsel erred in placing him on

the stand. In *Johnson*, we determined that counsel should have prevented the defendant's "incredibly lame" testimony by keeping him off the stand. *Id*. *Johnson* is inapposite, however, because there, the defense would likely have secured a not-guilty verdict if only the defendant had not taken the stand and obviously lied. Allen would not have enjoyed a similar security in not testifying. In addition, while Allen's counsel was not as artful as he could have been in eliciting Allen's testimony, his performance was not unreasonable. Finally, none of Allen's overstated complaints about his counsel's closing statement, such as that counsel "hardly referred to [Allen's] testimony and never argued its truth," undermines our confidence in the jury's guilty verdict.

## IV. Penalty-Phase Claims

### A. Ineffective Assistance of Counsel in the Penalty Phase

**[12]** A defendant "ha[s] a right — indeed, a constitutionally protected right — to provide the jury with . . . mitigating evidence." *Williams v. Taylor*, 529 U.S. 362, 393 (2000). We have explained that, "[t]o perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.' " *Mayfield*, 270 F.3d at 927 (quoting *Williams*, 529 U.S. at 399). Defense counsel's use of mitigation evidence to complete, deepen, or contextualize the picture of the defendant presented by the prosecution can be crucial to persuading jurors that the life of a capital defendant is worth saving. *See Wiggins v. Smith*, 123 S. Ct. 2527, 2542-44 (2003); Alex Kotlowitz, *In the Face of Death*, N.Y. Times, July 6, 2003, at 32-38, 46, 49 (attributing in part the decrease in imposition of the death penalty to defense attorneys' increasing skill and resourcefulness in presenting mitigation evidence).

We must assess whether the decision of Allen's counsel not to investigate or present certain mitigating evidence was "the

result of reasonable professional judgment," *Strickland*, 466 U.S. at 690, in light of all of the circumstances, "applying a heavy measure of deference to counsel's judgments," *Silva*, 279 F.3d at 836. If we determine that counsel's performance was deficient, Allen still "bears the highly demanding and heavy burden [of] establishing actual prejudice." *Williams*, 529 U.S. at 394 (internal quotation marks omitted).

### 1.   Deficient performance

Counsel's untimely, hasty, and incomplete investigation of potential mitigation evidence for the penalty phase fell outside the "range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

The Supreme Court recently emphasized the importance of investigating mitigation evidence, holding that counsel erred by inadequately investigating signs of a defendant's very troubled childhood. *Wiggins*, 123 S. Ct. at 2536-38. The *Wiggins* Court noted relevant ABA Guidelines, which provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* at 2537 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added)). The Court emphasized that an investigation into potential mitigating evidence should be thorough:

> In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. . . . *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy.

*Id.* at 2538.

**[13]** The failure to timely prepare a penalty-phase mitigation case is also error. In *Williams*, the Supreme Court found constitutional error where counsel waited until one week before trial to prepare for the penalty phase, thus failing to adequately investigate and put on mitigating evidence. 529 U.S. at 395; *see also Silva*, 279 F.3d at 841. In addition, legal experts agree that preparation for the sentencing phase of a capital case should begin early and even inform preparation for a trial's guilt phase:

> Counsel's obligation to discover and appropriately present all potentially beneficial mitigating evidence at the penalty phase should influence everything the attorney does before and during trial . . . .
>
> * * *
>
> The timing of this investigation is critical. If the life investigation awaits the guilt verdict, it will be too late. Although a continuance should be requested and may be granted between the guilt and penalty phases of a trial, it is likely to be too brief to afford defense counsel the opportunity to conduct a substantial investigation.

Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 320, 324 (1983) (footnote omitted). An expert testifying for Allen explained the lengthy process of preparing a mitigation case:

> [I]t is necessary to identify and interview the defendant's family members as well as past and present friends, fellow workers, etc., in order to adequately prepare for a capital trial. It is also necessary to obtain records, such as school records, employment

> records and medical records that may result in identi-
> fying mitigation themes and mitigation witnesses.
>
> Another time-consuming aspect of penalty phase
> preparation is obtaining the cooperation of mitiga-
> tion witnesses. For many reasons, mitigation wit-
> nesses are frequently reluctant to come to court.
> With time and multiple contacts, their reluctance can
> be overcome as they understand the role that they
> would play in the penalty phase of the trial and the
> significance of their testimony.

Allen's trial counsel failed to adequately investigate, pre-
pare, or present available mitigating evidence during the
trial's penalty phase. Trial counsel admitted at the habeas evi-
dentiary hearing that he did not specifically prepare for the
sentencing phase until after the guilt phase had concluded.
This left counsel one week in which to prepare the witnesses
and evidence necessary to persuade the jury to spare Allen's
life. Counsel also acknowledged that he failed to request a
continuance for further investigation. In addition, while Allen
provided his trial counsel a list of 26 potential mitigation wit-
nesses for the penalty phase, and Fresno probation reports
also listed potential witnesses, counsel and his investigator,
both inexperienced in handling capital cases, spoke to just a
few of the suggested witnesses.

Of the witnesses suggested by Allen and by the Fresno pro-
bation reports, counsel recalled contacting only four in prepa-
ration for the penalty phase. Telephone records and trial notes
indicate that he spoke with five additional potential witnesses.
Trial counsel testified at Allen's habeas evidentiary hearing
that most people he contacted were unwilling to testify; how-
ever, he admitted that he made fairly quick judgments about
these witnesses' attitudes and failed to discuss with them the
importance of mitigation testimony in the penalty phase.
While counsel may have made a sound decision not to call
Allen's former wife, Helen Sevier, during the guilt phase, he

admitted that he could not recall whether he considered using her as a witness in the penalty phase; nor could he recall if he had explored Allen's relationship with Sevier's daughter, Tammy.[2] Trial counsel also chose not to call Allen's thirteen-year-old granddaughter, Paula, as a mitigation witness, because the jury "would expect a grandchild to have nothing but good things to say about a grandparent."

**[14]** In his habeas evidentiary hearing, Allen produced many family members, friends, and former associates who affirmed that they would have testified as mitigation witnesses if Allen's counsel had asked them or if he had explained the importance of their testimony. Trial counsel failed to do so even though then-prevailing professional norms required such investigation. Trial counsel's failure to prepare for the sentencing phase until a week before that phase began, and his resulting failure to thoroughly investigate and present Allen's mitigation case, was constitutionally deficient.

### 2. Prejudice

A finding of error is not enough, however, to justify a grant of habeas relief. Allen must also demonstrate that his counsel's performance prejudiced him. We conclude that the evidence in mitigation, coupled with the potential mitigating evidence produced during these proceedings, is insufficient to outweigh the overwhelming evidence in aggravation.

During the evidentiary hearing, Allen proffered numerous witnesses. However, most had either lost touch with him long

---

[2]The parties stipulated before the district court that counsel made a reasonable tactical decision not to call Darlene Hope Allen, Allen's second and former wife. In addition, the district court correctly disregarded the failure to call Darlene, Don Stockbridge, and Kim Radisch, because Allen failed to make a showing that they would have testified if counsel had pursued them as witnesses.

before his crimes or lacked knowledge of Allen's criminal convictions and admissions. Allen's brother Glen testified that, if asked, he would have told the sentencing jury about the poor conditions in which his family lived as Allen grew up, Allen's hard work as a teenager on California farms, the loss of a very close sister as a child, and Allen's service as a preacher. Glen, however, only saw Allen once between 1963 and his imprisonment for the murder of Mary Sue Kitts in San Quentin and admitted that he had "slacked off" in writing to Allen. Moreover, he was unfamiliar with the facts underlying Allen's current murder and conspiracy charges.

Gene Tassey would have testified that Allen was a good supervisor, husband, and parent while the two worked together at Sunland Olive Co. in the 1950s; however, Tassey admitted that he had only limited contact with Allen after 1959. Similarly, Nadine Lemons, whose father, Donald Black, worked with Allen at Sunland Olive Co., would have testified to Allen's friendliness and generosity to her family; however, Nadine also saw Allen only off and on after 1959. As of the time of the evidentiary hearing, she was unaware of Allen's confessions to serious crimes. Nadine's husband, Lonnie, would have testified similarly to Nadine, but also lacked close contact with or recent knowledge of Allen.

Lonnie Vaughn, brother of Allen's ex-wife Helen Sevier, would have testified before the jury that he knew Allen to be a hard worker and involved in the church; however, Vaughn lost contact with Allen in 1957, long before his criminal life began. Vaughn's wife, Della Mae, would have testified to her knowledge of Allen as a pleasant, hard-working person who had served as a church deacon; however, she lost touch with Allen when her husband did. The Vaughns' son, Steve, had more recent interactions with Allen and could have testified to Allen's special relationship with Sevier's daughter, Tammy, and with Sevier's grandmother, Bonnie Nola. Steve called Allen "naturally likeable" and stated that he and his children — who had visited with Allen recently while he was

in prison — would be affected if Allen was executed. Still, Steve had very limited interaction with Allen between 1960 and 1977, and he was unaware that Allen had admitted to helping dispose of Mary Sue Kitts's body.

Betty Boriak, Sevier's niece who had lived with the family for a few months as a child and babysat Kenneth and Roger for several years, would have described Allen's and Sevier's family as close-knit; she stated that she loved Allen and would be hurt if he was executed. Boriak, however, lost contact with Allen in 1959 or 1960, and did not reconnect until 1977, when the two began exchanging letters. Toni Omstead, whose parents were Allen's landlords for a time, would have testified about instances in which Allen had been generous and helpful to Omstead's family; she believed that he had been a warm, friendly, and courteous person. Omstead, however, only knew Allen between 1964 and 1970, and she was unaware that Allen had admitted to committing robberies and to disposing of Kitts's body.

Katherine Proctor, the mother of Allen's daughter-in-law Kathy, would have told the sentencing jury that Allen was a friendly, kind, and considerate man and a devoted and generous grandfather. She would have testified that Allen welcomed her daughter Kathy into his family, and that she confided in Allen because he was an easy person to talk to. She also would have recounted a specific incident in which Allen rushed to the hospital with concern when one of his granddaughters had an asthma attack. Proctor did not know, however, that Allen had admitted committing armed robberies and disposing of Kitts's body, or that Allen's defense in his most recent murder and conspiracy trial was to blame Kenneth and Kathy for committing the crimes.

Allen's oldest granddaughter Paula also would have provided Allen with humanizing mitigation evidence during the sentencing phase if she had been asked. Paula, who was eight years old when Allen was arrested in 1977 and thirteen at the

time of Allen's 1982 trial, would have testified that Allen was very affectionate and generous to her. Paula testified, "I know what kind of person [Allen] is," and explained that Allen had "[taken] the fall for something he didn't do." Paula did not know, however, that Allen had admitted committing armed robberies and disposing of Kitts's body, or that Allen's defense against the 1982 murder and conspiracy charge was that Paula's parents had committed the crimes.

Connie Seidel, who knew Allen as her husband's employer, would have testified at Allen's sentencing trial that Allen was very generous and cared about his employees and their families' well-being. Seidel's knowledge of Allen was also limited, however, as she only knew him between 1971 and 1976, and she did not know that Allen had admitted committing robberies and disposing of Kitts's body, or that he had been convicted of killing Josephine Rocha and Doug White.

A more promising mitigation witness lay in family friend Chris Sund who, along with her now deceased husband, grew to know Allen through horse shows, visits to the Appleton Ranch (where Allen was once employed), and Allen's visits to the Sunds' ranch. Trial counsel did ask Sund to testify in mitigation, but Sund declined at the time.[3] She could have testified that Allen was particularly helpful to the Sunds when Chris's husband became ill, taking care of the Sunds' horses and donating blood. Chris Sund last saw Allen in 1975 or 1976, and they continue to correspond occasionally. Sund knew about much of Allen's criminal background, distinguishing her from most of the other proffered mitigation witnesses; she insisted, however, that this criminal background was inconsistent with the person she knew Allen to be. Sund explained her failure to testify at the time of trial, saying that her husband had been very ill and that it would have been

---

[3]Thus, we include this most favorable evidence in the total picture of potential mitigation, but do not find trial counsel deficient for having failed to present Sund.

"very difficult" to leave him for any period of time. Sund's daughter, Maida Lee, reiterated that her mother would have testified for Allen in 1982 if she had understood the importance of the testimony. Maida Lee could have testified that she believed Allen to be a gentle and kind-spirited man who enjoyed being around children. Maida Lee lost contact with Allen a couple of years before the Kitts murder, though, and did not know that Allen had confessed to committing robberies and disposing of Kitts's body.

Allen has also suggested that Sevier and her daughter, Tammy, could have served as useful mitigation witnesses if counsel had investigated that possibility. Indeed, Sevier testified that she, Kenneth, and Roger cared for Allen and would not want to see him put to death. Tammy could have testified that Allen was like a father to her after her biological father left. However, Department of Justice special agent Ken O'Farrell would have cast doubt on Sevier's credibility by testifying that Sevier complained of receiving a threatening letter from Allen after their divorce and that Sevier blamed Allen for her sons' criminal activities.

The other mitigation witnesses proffered by Allen would not have proved helpful given their own involvement in Allen's criminal enterprise. For example, Roger Allen would have described Allen's love as a father, but would also have been asked about his involvement in his father's criminal schemes. In addition, Roger testified that Allen had lied to him his entire life and claimed not to know that Allen admitted disposing of Kitts's (Roger's former live-in girlfriend's) body.

**Volume 2 of 2**

Donna Allen's testimony about Allen's positive qualities as a father-in-law and grandfather would also have been impeachable. Donna claimed to know nothing of Allen's negative side or his criminal life; however, Ben Meyer's girlfriend, Serise Zinich, was prepared to testify that Donna knew about Allen's commission of a K-Mart burglary with Meyer as it occurred. In addition, police officer Glen Upchurch would have testified that William Cross reported Donna's use in his store of coins stolen by Allen and his associates.

Similarly, the testimony of James Walker about his high esteem for Allen as an employer in the security business could have been impeached by testimony that Walker and Kenneth robbed a Pardini's Sunnyside together in 1970 or 1971.

**[15]** To establish prejudice, Allen "must show 'that there is a reasonable probability that but for counsel's unprofessional errors, the result . . . would have been different.' " *Williams*, 529 U.S. at 394 (quoting *Strickland*, 466 U.S. at 694). A " 'reasonable probability,' " in turn, is " 'a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). As explained by the Supreme Court in *Strickland*:

> When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Strickland*, 466 U.S. at 695. We thus agree with the district court that the question before us is "whether knowledge that [Allen] could be pleasant would have been enough that even one juror would have weighed it more heavily than the mountain of aggravating evidence." Like the district court before

us, we find that potential mitigation evidence that amounted to testimony that Allen could be pleasant is simply insufficient to outweigh all of the aggravating evidence. Accordingly, while counsel erred in failing to investigate and present the potential mitigation testimony of many family members, friends, and associates of Allen's, we cannot conclude that there is a reasonable probability, had trial counsel presented the potential mitigation evidence developed during habeas, that the jury would have weighed the evidence in favor of a life sentence.

First and foremost, the jury had just convicted Allen of murdering three people and conspiring to murder four others while he was already serving a life sentence for yet another murder. This raw fact is not outweighed by the available mitigating evidence because that evidence is entirely bereft of explanatory or exculpatory attributes, which are at the core of our belief in the importance of mitigation evidence:

> Evidence regarding social background and mental health is significant, as there is a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse."

*Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir.) (quoting *Boyde*, 494 U.S. at 382), *cert. denied*, 124 S.Ct. 49 (2003). In *Douglas*, the mitigation evidence presented was minimal. Two witnesses testified that Douglas had an aversion to the sight of blood and several testified as to his non-violent nature. *Id.* at 1087. A very generalized sociological history of the defendant was also introduced. *Id.* However, the jury did not hear information about the defendant's abandonment as a child, having an abusive alcoholic foster father who locked him in the closet for hours at a time, scavenging for food, being beaten and gang-raped as a young man in a Florida jail,

and possible mental health problems. *Id.* at 1088. We held that "[t]he available mitigating evidence that could have been introduced in Douglas's trial was precisely the type of evidence that we [had] found critical for a jury to consider when deciding whether to impose a death sentence." *Id.* at 1090.

Similarly, in *Silva*, where the defendant stood convicted of abduction, robbery, and murder, trial counsel's failure to present significant evidence regarding the defendant's abusive childhood, mental illnesses, organic brain disorders, and substance abuse "was profoundly prejudicial." 279 F.3d at 847. We reasoned that trial counsel's "failure to investigate Silva's background and to prepare evidence relating to his family history, mental health, and substance abuse problems resulted in an egregious failure to uncover and present a raft of potentially compelling mitigating evidence." *Id.* at 850.

The Supreme Court most recently addressed this issue in *Wiggins*, finding:

> The mitigating evidence counsel failed to discover and present in this case is powerful. . . . Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case. Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.

*Wiggins*, 123 S. Ct. at 2542. The Court concluded that, "had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Id.* at 2543.

**[16]** We have rarely granted habeas relief based solely upon humanizing, rather than explanatory, mitigation evidence in the face of extensive aggravating circumstances. In *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992) (per curiam), where the defendant had been convicted of participating in the murders of thirteen people, we did emphasize the role that such evidence could play: "Mak's defense counsel never placed Mak in the community nor portrayed Mak as a human being who was a devoted son with family members who loved him." While we ultimately granted Mak's petition for habeas relief, we never determined whether the prejudice arising from counsel's ineffective assistance was sufficient to grant relief. Rather, we relied on a cumulative-error analysis that included the erroneous exclusion of highly exculpatory evidence that implicated a third party in the murder and a jury instruction that misstated the applicable sentencing law. *Id.* at 622.

In *Mayfield*, we placed unique significance on humanizing mitigation evidence. Mayfield killed a woman and her son for swearing out an auto theft complaint against him, and then killed another man who witnessed the event. *Mayfield*, 270 F.3d at 918-19. Although "[t]he aggravating evidence against Mayfield was strong," and counsel had already solicited testimony from a psychiatrist about Mayfield's childhood diabetes, drug use, and psychological and social problems, we found counsel prejudicially ineffective for failing to present the additional available mitigation evidence. *Id.* at 929-32. Much of the potential mitigating testimony would have emphasized that Mayfield was a good, protective brother, a generous nephew, and not a violent person. *Id.* at 932. Mayfield's friends and family would have testified that they loved Mayfield and asked the jury to spare his life. Most, if not all, of the witnesses offered by Mayfield testified about their contemporaneous knowledge of him, and seemed to know about the darker side of his personality and life. Friends and siblings understood that Mayfield's years of drug and alcohol abuse, and his poorly controlled diabetes, had changed him. *Id.* at

931. Other factors played into our assessment of ineffective assistance as well, however, such as counsel's failure to present experts in endocrinology and toxicology to explain the chemical impact of Mayfield's illness and drug abuse. *Id.* at 932. We concluded:

> In light of the quantity and quality of the mitigating evidence [defense counsel] failed to present at trial, the duration of the jury's deliberations, and the jury's communication to the trial judge, we are not confident that, with the additional evidence presented at the evidentiary hearing, a unanimous jury would still have returned a sentence of death. If the jury had considered the testimony of experts in endocrinology and toxicology, or of friends and family members relating additional humanizing stories, there is a "reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed."

*Id.* (footnote omitted) (quoting *Strickland*, 466 U.S. at 700).

**[17]** By contrast, the mitigation evidence proffered by Allen, which consisted primarily of testimony that at some points in his life Allen had been nice to some people and that some people cared for him, is not of the same "quantity and quality" as that which supported our decision in *Mayfield*, and could not have "humanized" him during the time frame of the murder conspiracy at issue. The nature and quality of Allen's proffered mitigation testimony also removes this case from the realm of evidence which was found potentially persuasive to a jury in *Douglas*, *Silva* and *Wiggins*. None of the testimony is exculpatory, nor does it diminish Allen's culpability for any of his crimes in the spree which the evidence before the jury showed began in the 1970s.[4] None of the testimony

[4]Allen himself has indicated that his life of crime began much earlier.

portrays a person whose moral sense was warped by abuse, drugs, mental incapacity, or disease or who acted out of passion, anger or other motive unlikely to reoccur. Moreover, while Allen's proffered witnesses could have helped to humanize him somewhat, as a rule their knowledge of Allen was neither deep nor contemporaneous with his crimes. Those potential witnesses who knew Allen best were highly impeachable due to their involvement at his behest in his criminal activities.

Allen also points out that we recently granted habeas relief where the jury had been instructed not to consider "significant evidence related to [the defendant's] conduct during the period of his prior . . . incarceration and to his ability to conform his behavior to societal norms should he be confined within a structured prison environment," and thus was not allowed to consider "evidence . . . that if granted life without parole, [the defendant] would adapt well to prison life, would make a positive contribution to the welfare of others, and would not pose a future danger to the guards or the other inmates." *Belmontes v. Woodford*, 350 F.3d 861, 901 (9th Cir. 2003). Allen contends that this holding demonstrates the importance of non-exculpatory mitigation evidence such as that which his counsel failed to offer at trial. *Belmontes* is distinguishable, however, because the defendant there proffered meaningful evidence demonstrating his high likelihood of behaving well in prison, as well as evidence of a difficult childhood, in the absence of any strong aggravating factors:

> [W]e are convinced that the instructional error in this case, which prevented the jury from considering and giving effect to Belmontes' most important mitigation evidence, had a substantial and injurious effect on the jury's verdict. At the penalty phase of this trial the aggravating evidence was not strong. . . . The prosecutor candidly told the jury that there was not a lot in the way of aggravating evidence. He asked the jury to return a death sentence because of

the circumstances of the crime itself. Yet the crime, though shocking and deplorable, was in essence a robbery gone wrong. The murder, was not pre-planned, nor did it involve kidnapping, rape, torture, multiple victims, or any of the other especially heinous elements that usually are present when a jury votes for the ultimate penalty. In short, the . . . murder was of the kind that generally does not result in a death penalty.

*Id.* at 906-07.

Here, the evidence in aggravation was overwhelming. Although there was evidence that Allen was kind at times to some people, he was also, at least with respect to some proffered witnesses, simultaneously controlling and calculated in organizing his crime family and robbing and murdering multiple victims. In *Wiggins*, the Supreme Court explained that, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." 123 S. Ct. at 2542. We have denied habeas claims of ineffective assistance of counsel where aggravating factors were extensive. In *Campbell v. Kincheloe*, 829 F.2d 1453 (9th Cir. 1987), where the defendant sought out, beat, strangled, and killed a woman who had testified against him, and then cut the throats of her daughter and another witness, we held that such aggravating circumstances outweighed the potential mitigation evidence of the defendant's background, childhood, and family relationships, even assuming that such mitigation testimony did not open the door to rebuttal evidence. *Id.* at 1464. Similarly, in *Gerlaugh v. Stewart*, 129 F.3d 1027 (9th Cir. 1997), where the defendant was a probationer who committed a savage robbery and murder intended in part to "save himself from prison," we found that the defendant was not prejudiced by his counsels' failure to introduce evidence that he had "been kind to his elders, to dogs, and to rodents." *Id.* at 1042. In *Woodford v. Visciotti*, 537 U.S. 19 (2002) (per curiam), trial counsel failed to present evidence of Visciotti's

troubled family background, which included "his being berated, being markedly lacking in self-esteem and depressed, having been born with club feet, having feelings of inadequacy, incompetence, inferiority, and the like, moving 20 times while he was growing up, and possibly suffering [from] a seizure disorder." *Id.* at 26 (internal quotation marks omitted). The United States Supreme Court found it not unreasonable for the California Supreme Court to hold that the circumstances of the crime, "a cold-blooded execution-style killing of one victim and attempted execution-style killing of another, both during the course of a preplanned armed robbery," coupled with the aggravating evidence of prior offenses, "the knifing of one man, and the stabbing of a pregnant woman as she lay in bed trying to protect her unborn baby," were so severe that Visciotti suffered no prejudice from trial counsel's inadequacy. *Id.*

After weighing the total potential mitigating evidence against the evidence in aggravation, we are compelled to conclude that every juror would have reached only one result. Allen had a long history of orchestrating and committing violent robberies and burglaries. He masterminded eight armed robberies; among his victims were grocery clerk Lee McBride, who was shot and sustained permanent damage to his nervous system, and K-Mart employee John Attebery, who was permanently disabled from being shot in the chest. Next, Allen was convicted of directing the murder of Mary Sue Kitts, his own son's live-in girlfriend. This murder was motivated by Allen's oft-spoken hatred for "rats." Upon his conviction for conspiracy and the murder of Mary Sue Kitts, Allen plotted from prison the murder of those who had testified to put him there. Allen demonstrated both a lasting hatred for those who had "ratted" him out and an ability to reach beyond prison walls in seeking his revenge. By conspiring and orchestrating the murders of the witnesses against him, Allen destroyed several lives. Moreover, by attacking the witnesses against him, Allen struck the greatest blow possible upon our criminal justice system. Meanwhile, Allen has

expressed no remorse for the crimes that he committed. Given the nature of Allen's crimes, sentencing him to another life term would achieve none of the traditional purposes underlying punishment: incapacitation, deterrence, retribution, or rehabilitation. *See Ewing v. California*, 123 S. Ct. 1179, 1187 (2003). The rationale for incapacitation is to allow society to "protect itself from persons deemed dangerous because of their past criminal history." 1 W. LaFave & A. Scott, *Substantive Criminal Law* 38 § 1.5 (2003). Incapacitation is thus used to justify execution "for those offenders believed to be beyond rehabilitation." *Id.* By committing a capital crime while having already been maximally punished and while behind walls thought to protect society, Allen has proven that he is beyond rehabilitation and that he will continue to pose a threat to society.

The Supreme Court deems defendants who have committed murder while serving a life term in prison unique among capital defendants. In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court "express[ed] no opinion as to whether the need to deter certain kinds of homicide would justify a *mandatory* death sentence as, for example, when a prisoner — or escapee — under a life sentence is found guilty of murder." *Id.* at 605 n.11 (emphasis added). The Court resolved its ambivalence in favor of such defendants in *Sumner v. Shuman*, 483 U.S. 66 (1987); however, that decision was premised on the fact that a capital murder committed in prison could involve a variety of circumstances, reflecting various levels of culpability. "Just as the level of an offender's involvement in a routine crime varies, so too can the level of involvement of an inmate in a violent prison incident." *Id.* at 79. Thus, a life prisoner such as Shuman could conceivably commit a capital crime arising out of a violent prison confrontation, *id.*, or, as here, the crime could arise out of calculation and manipulation. The especially aggravating circumstances of Allen's triple-murder and conspiracy are those for which the Supreme Court envisions the harshest penalty.

**[18]** Because Allen orchestrated the brutal murder of witnesses while already serving a life term in prison, expressed no remorse for any of his crimes, and supports his claim with only the testimony of witnesses lacking contemporaneous or complete knowledge of him, we hold that the aggravating factors surrounding Allen's commission of triple-murder and conspiracy outweigh the total available mitigation evidence. Thus, although Allen's counsel was deficient in failing to thoroughly investigate and present mitigation evidence in the penalty phase of Allen's trial, that deficiency does not undermine our confidence in the jury's verdict. We do not hold that humanizing, non-exculpatory evidence can *never* be enough to establish prejudice. Rather, we simply hold that the quality and quantity of the particular evidence offered by Allen, in light of the heinous nature of his crimes, does not establish prejudice.

B.   The Jury's Sentencing Power

**[19]** Allen contends that the trial court's sentencing instruction, combined with the prosecutor's closing statement, misled the jury as to its sentencing power and arbitrarily denied him an individualized sentencing determination. We disagree.

The trial court issued the following standard instruction:

> After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.
>
> If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall

impose a sentence of confinement in the State prison for life without the possibility of parole.

CALJIC No. 8.84.2.

Allen acknowledges that any "claim that the 'shall impose' language of CALJIC 8.84.2 unconstitutionally prevents 'individualized assessment' by the jury is . . . without merit." *Boyde*, 494 U.S. at 377; *see also Blystone v. Pennsylvania*, 494 U.S. 299, 306-07 (1990). He argues, however, that the jury instruction was rendered unconstitutional by the prosecutor's closing argument emphasis of the mandatory nature of the instruction. The *Boyde* Court acknowledged that prosecutorial argument could "have a decisive effect on the jury," 494 U.S. at 384; however, the Court also noted that "prosecutorial misrepresentations . . . are not to be judged as having the same force as an instruction from the court," and that "arguments of counsel, like the instructions of the court, must be judged in the context in which they are made," *id.* at 384-85.

Allen objects in particular to the following argument of the prosecutor:

> If you conclude that the aggravating evidence outweighs the mitigating evidence, you shall return a death sentence. Shall; not may, not might, not maybe. It is very explicit. If the aggravating evidence outweighs the mitigating evidence, you shall return a verdict of death.

When considered in context, however, there is no reasonable likelihood that the prosecutor's statements rendered the jury's consideration of the trial court instruction unconstitutional. *See id.* at 383. Indeed, the prosecutor spent much of his closing argument discussing both the aggravating and the mitigating evidence, specifically asking the jury to think about how such evidence should be weighed. The California Supreme Court's findings that "the prosecutor not once suggested the

weighing process was a mechanical function" and "did nothing to mislead the jury about its weighing discretion" are supported by the record. As the prosecutor did not mislead the jury regarding its discretion, Allen was denied neither a federal right nor a state-created liberty interest.

### C. The Trial Court's Inflation of Special Circumstances Findings

**[20]** We agree with the district court that the trial court's error in counting the special circumstances was harmless. In California, a finding of even one special circumstance qualifies a defendant for the death penalty, and special circumstances are considered in the penalty phase as aggravating factors. Cal. Penal Code §§ 190.2, 190.3. Here the jury properly found three categories of special circumstances going into the penalty phase: multiple murder, witness killing, and prior murder conviction. However, the jury found six multiple-murder special circumstances (applying two counts of multiple murder to each of the three murders of which Allen was convicted); two witness-killing special circumstances (by relying on two different witness-killing theories); and three prior-murder special circumstances (applying one prior-murder count to each of the three murder convictions). The jury thus technically considered eleven special circumstances rather than three.

No one disputes that the trial court erred. This error, however, did not substantially and injuriously affect the jury's verdict. *Brecht*, 507 U.S. at 629. Allen's actual conduct was never inflated; the jury had before it all the relevant facts from which any one special circumstance, supporting the death penalty, could be formed. The jury's weighing of aggravating and mitigating factors in California "is 'a mental balancing process,' but not one that involves a 'mechanical counting of factors' on either side of some imaginary scale, or 'the arbitrary assignment of "weights" ' to any factor." *People v. Bacigalupo*, 6 Cal. 4th 457 (1993) (quoting *People v. Brown*, 40

Cal. 3d 512, 541 (1985)). Instead "the special circumstances serve to " 'guide' " and " 'channel' " jury discretion 'by strictly confining the class of offenders eligible for the death penalty.' " *Id.* at 467 (quoting *Brown*, 40 Cal. 3d at 539-40). And the section 190.3 aggravating factors serve to " 'direct the sentencer's attention to specific, provable, and commonly understandable facts about the defendant and the capital crime that might bear on [the defendant's] moral culpability.' " *Id.* at 476 (quoting *People v. Tuilaepa*, 4 Cal. 4th 569, 595 (1992)).[5]

Moreover, we agree with the California Supreme Court's harmless-error analysis, which reflects the prosecutor's relative inattention to the special circumstances considered as aggravating factors:

> In view of the fact that . . . we are confident the jury understood the scope of its sentencing role, and that it knew of its exclusive discretion to determine whether death is appropriate in this case — and in the face of the People's overwhelming penalty evidence, and the comparatively slight emphasis put on the special circumstances as aggravating factors and concomitant major emphasis on defendant's present and former convictions and uncharged crimes as aggravating factors - it cannot be said there is any reasonable possibility the complained-of error affected the penalty verdict.

*Allen*, 42 Cal. 3d at 1282-83; *see also Williams v. Calderon*, 52 F.3d 1465, 1480 (9th Cir. 1995) (state court found erroneous charging of six multiple-murder special circumstances rather than one to be harmless); *Bonin v. Calderon*, 59 F.3d

---

[5]The State contends that several of Allen's claims, including this one, are barred by *Teague v. Lane*'s rule of non-retroactivity. *See* 489 U.S. 288 (1989). We reject the State's *Teague*-related arguments, except as they relate to Allen's claim that the trial court should have conferred immunity upon certain guilt phase witnesses. *See supra* p. 968.

815, 849 (9th Cir. 1995) (state court found erroneous charging of fourteen multiple-murder circumstances rather than one to be harmless). We agree with the state court's finding of harmlessness, and affirm the district court's denial of relief.

D.   The Double- and Triple-Counting of Allen's Prior Crimes as Aggravating Factors

Allen contends that the aggravating factors presented to the jury permitted the jury to double- and triple-count his prior crimes and thus undermined the jury's death verdict. We hold that the error was harmless.

Allen asserts that the presentation of the following factors allowed for the inappropriate double- and triple-counting:

> [(a) T]he existence of any special circumstances admitted or thought to be true, [(b)] the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence, [and (c)] the presence or absence of any felony conviction.

The State contends that the jury's consideration of these factors could not have been improper because each deals with a different attribute of Allen's present crimes and previous criminal activity. According to the State, "[n]one of these factors necessarily subsume[s] each other."

Considered individually, aggravating factors (a), (b), and (c) are each valid. The Supreme Court upheld the validity of factors (a) and (b) in *Tuilaepa v. California*, 512 U.S. 967 (1994), concluding that factor (a) concerned the circumstances of the immediate crime being punished and factor (b) addressed "the defendant's prior criminal activity." *Id.* at 976. The Court also "[r]el[ied] on the basic principle that a factor is not unconstitutional if it has some 'common-sense core of meaning . . . that criminal juries should be capable of under-

standing.' " *Id.* at 973 (quoting *Jurek v. Texas*, 428 U.S. 262, 279 (1976)).

Here, however, the trial court's instructions and the prosecutor's argument together encouraged the jury to consider Allen's prior criminal activities under all of the above three factors. These aggravating factors were thus effectively subsumed within each other. As expressed by the Tenth Circuit in *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996):

> Such double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally. . . . [W]hen the same aggravating factor is counted twice, the defendant is essentially condemned twice for the same culpable act, which is inherently unfair.

*Id.* at 1111 (internal quotation marks omitted).

The State misplaces reliance on *Jones v. United States*, 527 U.S. 373 (1999), and *United States v. Luna-Herrera*, 149 F.3d 1054 (9th Cir. 1998). *Jones* is distinguishable because "the factors as a whole [in that case] were not duplicative." 527 U.S. at 399. There, one factor asked whether the victim was especially vulnerable to the petitioner's attack, and the other contemplated the victim's personal traits and the effect of the crime on her family. *Id.* at 400. *Luna-Herrera* involved a completely different sentencing context altogether. There, we held that the aggravated felony serving as a basis for the increase in a defendant's base offense level could also be used in calculating that defendant's criminal history score, and that the prior felony conviction forming part of the basis for the defendant's deportation was not "relevant conduct" with respect to the instant conviction for purposes of applying the sentencing guidelines. *Luna-Herrera*, 149 F.3d at 1055-56.

Moreover, we suggested the impropriety of overlapping aggravating factors in *Bonin*, 59 F.3d at 848. There, we rejected the petitioner's double-counting claim, concluding it had been foreclosed by *Tuilaepa*'s upholding of aggravating factors (a) and (b). *Id.* Our decision in *Bonin*, however, presupposed that "paragraph (a) obviously refers to the crimes for which the defendant has been convicted [and] paragraph (b) is intended to refer to crimes for which the defendant has not been convicted." *Id.* Such is not the case here, where the jury was encouraged to consider Allen's prior crimes under factors (a), (b), *and* (c).

**[21]** Because "California is . . . a 'weighing' state," *Silva*, 279 F.3d at 829 n.1, we review the improper double-counting of aggravating factors under a "constitutional harmless-error analysis . . . ." *Hoffman v. Arave*, 236 F.3d 523, 541 (9th Cir. 2001). We conclude that the error here was harmless. As noted by the district court, there is no support in the record "for the assumption that the jury mechanically doubled the weight of the prior felonies or tripled the weight of the Kitts murder because it fit under more than one factor." Although the prosecutor did ask the jury to consider Allen's prior crimes under multiple aggravating factors, he did not ask the jury to merely add up those factors; instead, he emphasized different ways that the jury could consider and quantify them. In addition, the severity and sheer number of Allen's prior crimes convince us that the jury's consideration of the crimes just once in the weighing of aggravating and mitigating factors would have yielded the same verdict. The double- and triple-counting error is thus harmless.[6]

---

[6]As noted by the district court, because the state court did not perform a harmless error analysis of this claim, it is unclear whether the *Brecht* "substantial and injurious effect" standard or the state "harmless beyond a reasonable doubt" standard applies. *See Chapman v. California*, 386 U.S. 18 (1967). The Circuits are split on this issue, and neither we nor the Supreme Court has directly addressed it; however, both this Court and the Supreme Court have applied the *Brecht* standard without consideration of

E.  Preclusion   of   Testimony   Regarding   Allen's
    Conforming Conduct in County Jail

**[22]** Allen contends that the trial court's preclusion of cer-
tain testimony by correctional officer Delma Graves deprived
him of his right to "place before the sentencer relevant evi-
dence in mitigation of punishment." *Skipper v. South Caro-
lina*, 476 U.S. 1, 4 (1986). Although the trial court likely erred
in this regard, such error was harmless.

The trial court sustained the prosecutor's relevance objec-
tion to defense counsel's question asking whether Allen had
caused trouble, other than the attack on Glenn Bell, while
incarcerated in the Fresno County Jail. In *Skipper*, where the
trial court excluded from the sentencing hearing testimony
about the petitioner's good behavior for the more than seven
months he spent in jail awaiting trial, the Supreme Court con-
cluded that "[t]he exclusion by the state trial court of relevant
mitigating evidence impeded the sentencing jury's ability to
carry out its task of considering all relevant facts of the char-
acter and record of the individual offender" and that "[t]he
resulting death sentence [could not] stand." *Id.* at 8; *see also
Hitchcock v. Dugger*, 481 U.S. 393, 398-99 (1987) ("We
think it could not be clearer that the advisory jury was
instructed not to consider, and the sentencing judge refused to
consider, evidence of nonstatutory mitigating circumstances,
and that the proceedings therefore did not comport with the
requirements of *Skipper*.").

The State's citation to *Pizzuto v. Arave*, 280 F.3d 949 (9th
Cir. 2002), is inapposite. In *Pizzuto*, the mitigating evidence

---

the extent of state court review. *See O'Neal v. McAninch*, 513 U.S. 432
(1995); *Rice v. Wood*, 77 F.3d 1138, 1144 (9th Cir. 1996) (en banc); *Wil-
liams*, 52 F.3d at 1476; *Hegler v. Borg*, 50 F.3d 1472, 1474, 1478 (9th Cir.
1995); *Lee v. Marshall*, 42 F.3d 1296 (9th Cir. 1994) (per curiam); *Chris-
tian v. Rhode*, 41 F.3d 461 (9th Cir. 1994). We need not reach this issue,
however, because here the error is harmless under either standard.

included information not only about *Pizzuto*'s good job performance, but also about his "major misconducts." *Id.* at 966. Counsel thus decided not to proffer that evidence. *Id.* at 967. Here, Graves had already testified as to Allen's misconduct; as far as the record demonstrates, Graves's further testimony would have offered no new negative information.

The testimony that Allen's counsel sought to elicit from Graves would not, however, have made a substantial showing of Allen's good behavior. Graves's testimony would not have overcome the many aggravating factors in this case; indeed, Graves had just testified about Allen's organization of the assault on Bell. Moreover, Allen had been found guilty of orchestrating the murder of witnesses from prison. Under either the *Chapman* or the *Brecht* standard, the trial court's error was harmless.

F. Use of CALJIC Instruction No. 2.11.5

**[23]** Given the totality of the trial court's instructions to the jury, the trial court's instruction not to consider the prosecution status of others involved in Allen's aggravation crimes was not constitutional error.

Pursuant to CALJIC No. 2.11.5, the trial court instructed the sentencing jury:

> There has been evidence in this case indicating that a person, other than the defendant, was or may have been involved in the crimes of which the defendant is now alleged to have committed.

> You must not discuss or give any consideration as to why the other person is not being prosecuted or whether he has been or will be prosecuted.

In light of the Use Note to CALJIC No. 2.11.5, which reads "[t]his instruction is not to be used if the other person is a wit-

ness for either the prosecution or defense," the trial court was mistaken in using the instruction in the penalty phase; however, that mistake did not rise to the level of constitutional error.

"When considering an allegedly erroneous jury instruction in a habeas proceeding, an appellate court first considers whether the error in the challenged instruction, if any, amounted to 'constitutional error.' " *Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir. 2001) (quoting *Calderon v. Coleman*, 525 U.S. 141, 147 (1998)). To determine constitutional error,

> an appellate court asks whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. That inquiry also can be described as having two parts: (1) whether there is a reasonable likelihood that the jury understood an assertedly ambiguous instruction to mean what the defendant suggests it means; and (2) if so, whether the instruction, so understood, was unconstitutional as applied to the defendant.

*Id.* (citation and internal quotation marks omitted).

Allen fails to get past the first hurdle. The trial court issued several other instructions which made it clear that the jury was to consider the motivation of the several witnesses against Allen. These instructions addressed witness bias, accomplice testimony, and the fact that the jury must consider the court's instructions as a whole. *See id.* at 834 ("A single instruction is not viewed in isolation, but in the context of the overall charge." (internal quotation marks omitted)). Given the totality of the trial court's instructions, the jury could not reasonably have understood the instruction at issue to forbid it from considering witnesses' motivation and bias.

### G.  The Prosecutor's Closing Argument

**[24]** Allen contends that several instances of prosecutorial misconduct during closing argument "so infected the trial with unfairness as to make the resulting [judgment for death] a denial of due process." *See Darden*, 477 U.S. at 181 (internal quotation marks omitted). We hold that any prosecutorial misconduct in these circumstances was harmless.[7]

### 1.  Commentary on Allen's Demeanor

After describing Allen as the mastermind behind all the charged crimes, the prosecutor stated, "[h]e is not listening to any of this, of course." It is unclear whether this commentary on Allen's demeanor during the trial's sentencing phase was improper. Comments on a non-testifying defendant's demeanor are inappropriate during the guilt phase because character is not at issue. *Schuler*, 813 F.2d at 980-81; *People v. Heishman*, 45 Cal. 3d 147, 197 (1988). Commentary upon demeanor may be appropriate in the penalty phase, however, where the defendant's credibility is at issue. *Id.* at 197 ("[P]rosecutor's references to defendant's facial demeanor . . . made at a penalty trial in which defendant had placed his own character in issue as a mitigating factor . . . [were] proper . . . .").

Even assuming that this comment amounted to misconduct, however, an issue we need not decide, any error was insignificant in relation to the whole of the sentencing phase and the prosecutor's closing argument; nor was it particularly inflam-

---

[7]The State contends that the district court should not have addressed prosecutorial misconduct because Allen's counsel did not object at trial. While this is generally true, the district court correctly noted that federal courts usually disregard a state procedural default if the state court chooses to do so. As the California Supreme Court denied Allen's prosecutorial misconduct claim on the merits, the district court was not barred from considering it. *See Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

matory. The comment was not sufficiently prejudicial to support our finding a due process violation. *See Darden*, 477 U.S. at 181; *Donnelly*, 416 U.S. at 639.

2. Implication that Allen and Counsel Conspired to Retaliate Against Witnesses

During his closing argument, the prosecutor implied that defense counsel's questioning of witnesses was meant to secure information that would be used to identify and retaliate against those witnesses later. The implicating comment was improper; a prosecutor "may not make comments calculated to arouse the passions or prejudices of the jury." *United States v. Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999); see also *United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994) ("A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future law breaking."), *aff'd in part and rev'd in part on other grounds*, 518 U.S. 81 (1996). However, in view of the overwhelming evidence of Allen's guilt and the trial court's instruction that the statements of counsel were not evidence, the prosecutor's comment was not so prejudicial as to render Allen's sentencing trial fundamentally unfair. *Darden*, 477 U.S. at 181.

3. Improper Characterizations of Allen

We agree with Allen that the prosecutor's comparison of him to Adolf Hitler was improper.[8] Again, however, this reference did not render the penalty phase unfair. The reference to Hitler was pure argument. Moreover, the trial court admonished the jury not to consider such statements as evidence. As explained in *United States v. North*, 910 F.2d 843 (D.C. Cir.) (per curiam), *withdrawn in part on other grounds*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam), "[t]o suspect that the refer-

---

[8]We disagree that the comparison of Allen to an organized crime "godfather" was improper, given his own description of himself at trial.

ence to Hitler swayed the jury on a close and critical issue would underestimate the common sense that we properly attribute to the jury." *Id.* at 895.

### 4. Focus on the Victims and Family Impact

While portions of the prosecutor's argument about the victims and their families were emotional, these references were not improperly inflammatory. Even if the prosecutor's commentary were evidence, which it was not, the Supreme Court explained in *Payne v. Tennessee*, 501 U.S. 808, 823-25 (1991), that there is no per se Eighth Amendment bar to victim impact evidence: "In the majority of cases, and in this case, victim impact evidence serves entirely legitimate purposes." *Id.* at 825. We reiterated in *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997), that "[e]vidence about a victim's characteristics and the impact of the murder on the victim's family is relevant and admissible at a death penalty sentencing proceeding. Admission of such evidence will only be deemed unconstitutional if it is so unduly prejudicial that it renders the sentence fundamentally unfair." (Citation omitted); *cf. Fields v. Woodford*, 281 F.3d 963, 978-79 (9th Cir.) (disapproving of victim impact evidence but refraining from reversing the jury verdict where the evidence was not prejudicial), *amended on other grounds*, 315 F.3d 1062 (9th Cir. 2002); *People v. Miranda (In re Miranda)*, 44 Cal. 3d 57, 113 (1987). Here, the prosecutor's statements about the victims and their families did not render the sentencing phase fundamentally unfair.

### 5. Statements Regarding the Jury's Responsibility

The prosecutor's argument did not unacceptably diminish the responsibility of the jury in sentencing Allen. The Supreme Court narrowly defined such error in *Romano v. Oklahoma*, 512 U.S. 1 (1994), as

> relevant only to certain types of comment — those that mislead the jury as to its role in the sentencing

process in a way that allows the jury to feel less responsible than it should for the sentencing decision. Thus, '[t]o establish [such a] violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.'

*Id.* at 9 (citation and internal quotation marks omitted). The prosecutor here did not improperly describe the jury's role. Rather, he seemed to counter defense counsel's suggestion that the jury would be committing a moral wrong by sentencing Allen to death. The prosecutor's argument that Allen was ultimately responsible for his actions and that the jury must follow the law were not inappropriate and provide no basis for relief.

## H. The Trial Court's Conversion of Inapplicable Mitigation Factors into Aggravating Factors

[25] The trial court's improper finding of aggravating factors in reviewing the jury's verdict was also harmless error. California law directs the trial judge to automatically and independently review a jury's sentencing verdict to determine whether it is contrary to the law or to the evidence presented. Cal. Penal Code § 190.4(e). In conducting this review, the trial court converted each of the following factors into aggravating factors:

Factor (d) — Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;

Factor (e) — Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act;

Factor (f) — Whether or not the offense was committed under circumstances which the defendant rea-

sonably believed to be a moral justification or extenuation for his conduct;

Factor (g) — Whether or not the defendant acted under extreme duress or under the substantial domination of another person;

Factor (i) — The age of the defendant at the time of the crime;

Factor (j) — Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense is relatively minor; and

Factor (k) — Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

The trial court expressly concluded that the mitigating circumstances addressed in the above factors did not apply to Allen's case and converted each to an aggravating factor. As reasoned by the California Supreme Court, however, the absence of mitigating circumstances under these factors should not be considered aggravating:

"[A]ggravation" is by definition a circumstance above and beyond the essential constituents of a crime which increases its guilt or enormity or adds to its injurious consequences. Mitigating circumstances, on the other hand, are ones which although not constituting an excuse for or justification of the crime, may be considered as extenuating or reducing the degree of moral culpability. Thus, the absence of mitigation would not automatically render the crime more offensive than any other murder of the same general character.

Several of the statutory mitigating factors are particularly unlikely to be present in a given case. (See,

especially, § 190.3, subds. (e) and (f) . . . .) To per-
mit consideration of the absence of these factors as
aggravating circumstances would make these aggra-
vating circumstances automatically applicable to
most murders.

*People v. Davenport*, 41 Cal. 3d 247, 289 (1985) (internal
citations omitted). While courts have expressly held that fac-
tor (i) regarding age can serve as either an aggravating or mit-
igating circumstance, *Tuilaepa*, 512 U.S. at 977; *Bonin*, 59
F.3d at 848, the trial court erred in applying the remainder of
the above factors as aggravators even though the absence of
the specified mitigating circumstances did not render Allen's
crime more offensive than other crimes of the same nature.

This error, however, does not undermine our confidence in
the jury's verdict. The trial court's review merely ensured that
the jury's death verdict was not contrary to the weight of the
evidence. Even without these factors, extensive aggravating
evidence supported the jury's verdict. Due to the limited
nature of the trial court's query, *see People v. Lang*, 49 Cal.
3d 991, 1045 (1989), and the existence of many valid aggra-
vating factors, this error was not prejudicial.

I.  The Trial Court's Consideration of Presentence Reports
     in its Modification Decision

Although the trial court erred as a matter of state law by
considering in its review of the jury's verdict presentence
reports that had not been considered by the jury, that error
neither prejudiced Allen nor denied him his Eighth Amend-
ment or due process rights.

While California Penal Code § 190.4 limits the trial court
to review of the evidence before the jury in its automatic con-
sideration of whether to modify the verdict, the trial court
here requested and reviewed presentence reports prepared by
the probation officer. These reports contained evidence, such

as letters from the victims' families and a recommendation of death by the probation officer, that the jury had never considered.

The record demonstrates, however, that the trial court's error was harmless. In its decision on reconsideration of the jury's verdict, the trial court explained its analysis as to each of the § 190.3 factors and only once referred to information found in the presentence report and not elsewhere in the evidence considered by the jury. That one instance concerned the presentence report's determination that Allen was born on June 16, 1930. We affirm the district court's reasoning that "[t]he evidence of [Allen's] age can hardly be considered prejudicial to [him] and was, in any event, generally before the jury."

J.   Lack of Interproportionality Review

**[26]** We find no merit in Allen's claim that the State's lack of "intercase proportionality review" violated his due process and equal protection rights.

Allen's claim is premised on California's requirement that the Board of Prison Terms review every sentence imposed under the Determinate Sentencing Law to ascertain its proportionality with other sentences, and the lack of a comparable requirement in the capital sentencing scheme. Allen's due process argument is foreclosed by the Supreme Court's holding in *Pulley v. Harris*, 465 U.S. 37, 43-46 (1984), that neither the Eighth Amendment nor due process requires comparative proportionality review in imposing the death penalty. The California Supreme Court has agreed that "neither the federal nor the state Constitution compels comparative sentence review." *People v. Sanders*, 51 Cal. 3d 471, 529 (1990); *see also Lang*, 49 Cal. 3d at 1045. To the extent that Allen's equal protection claim survives the above holdings, we agree with the California Supreme Court that defendants sentenced under the Determinate Sentencing Law are not sim-

ilarly situated to defendants sentenced in the capital system. *See Allen*, 42 Cal. 3d at 1286-88. We thus reject this claim as a basis for habeas relief.

V.   Cumulative Error

**[27]** Allen argues that when considered cumulatively, the errors committed by the trial court, prosecutor, and defense counsel in both the guilt and penalty proceedings prejudiced him sufficiently to undermine confidence in the jury's verdicts. *See Karis v. Calderon*, 283 F.3d 1117, 1132 (9th Cir. 2002), *cert. denied*, 123 S.Ct. 2637 (2003); *Mak*, 970 F.2d at 622. Even considered cumulatively, though, these errors are not sufficiently prejudicial to overcome the overwhelming evidence, derived from numerous sources, of Allen's guilt, or the uniquely aggravating circumstances surrounding Allen's crimes.

VI.   Conclusion

Evidence of Allen's guilt is overwhelming. Given the nature of his crimes, sentencing him to another life term would achieve none of the traditional purposes underlying punishment. Allen continues to pose a threat to society, indeed to those very persons who testified against him in the Fran's Market triple-murder trial here at issue, and has proven that he is beyond rehabilitation. He has shown himself more than capable of arranging murders from behind bars. If the death penalty is to serve any purpose at all, it is to prevent the very sort of murderous conduct for which Allen was convicted. Therefore, we affirm the district court's denial of Allen's petition for a writ of habeas corpus.

**AFFIRMED.**