O’SCANNLAIN, Circuit Judge,
dissenting.
I respectfully dissent from the court’s conclusion that Correll has met the “highly demanding and heavy burden of establishing actual prejudice” in the pursuit of his claim of ineffective assistance of counsel during the penalty phase of the trial. Allen v. Woodford, 395 F.3d 979, 1000 (9th Cir.2005) (internal quotation marks omitted). The majority ignores the mountain of precedent which provides that, in assessing prejudice, we must consider not only the likely benefits of the mitigating evidence counsel failed to present, but also its likely drawbacks. The majority also substitutes its independent analysis of the record for that of the district court, and relies on its own view of the evidence rather than considering, as we must, the effect the evidence would have had on an Arizona sentencing judge twenty-two years ago. Because I do not believe that Correll has met his burden “affirmatively [to] prove prejudice,” I would affirm the judgment of the district court denying the petition for writ of habeas corpus. See Strickland v. Washington, 466 U.S. 668, 693, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
I
The facts of Correll’s brutal crimes are disturbing,- but must be recounted to illustrate the unlikelihood that Correll’s new evidence would have convinced the sentencing judge not to impose the death penalty.[1]
A
On the night of April 11, 1984, as Guy Snelling and his girlfriend Debra Rosen were getting ready to go to sleep, a knock came at the door. Snelling answered the door and found John Nabors, his co-worker, and Correll, whom he had not met.
After Snelling let the two men into his home, Nabors pulled a gun and demanded money. Correll secured Snelling and Ro-sen with duct tape. When Robin Cady and Shawn D’Brito, two friends of Snell-ing, unwittingly arrived at the house, Cor-rell secured them with duct tape as well. Then Correll and Nabors escorted Snelling throughout his home to search for money and valuables.
After raiding the house for approximately 45 minutes, Nabors and Correll exited with Cady, D’Brito, and Snelling, whom *1020 they forced into Cady’s car. Nabors briefly went back inside to secure Rosen. While holding the gun on the three victims, Correll drove to a deserted area where Nabors’s truck was parked. Na-bors took his truck and followed Correll, who was still driving Cady’s car with the three victims, to a desert area north of Phoenix. There, they forced the three victims out of the car and made them lie face down on the ground. Correll shot Snelling in the back of the head. Nabors then shot and killed D’Brito, and then tried to shoot Cady. The gun misfired a couple of times and Correll said “hurry up, hurry up, ... okay, it’s cool, no cars coming, get a shell chambered.” After reloading the gun, Nabors was finally successful in shooting and killing Cady. After Correll and Nabors left, Snelling, who miraculously did not die, reported the crime. Rosen, whom Nabors and Correll had left in the house when they drove the other three victims into the desert, was later found in the house, killed by strangulation.
B
At trial, Correll’s sole defense was mis-identification — namely, that Snelling, who was under the influence of drugs and alcohol when the crimes occurred, had wrongly identified Correll as one of his assailants, and that it was reasonably likely that Cor-rell’s brother Terry, who resembled Cor-rell, had committed the crimes in Correll’s stead. Unpersuaded by this defense, a jury convicted Correll of three counts of first degree murder, one count of attempted first degree murder, one count of armed robbery, one count of first degree burglary, and four counts of kidnaping.
At sentencing, the government urged the court to impose the death penalty. The government asserted that five statutory aggravating factors were present: (1) a previous violent felony conviction;[2] (2) grave risk of death to others in addition to the persons murdered;[3] (3) commission of the murders in anticipation of pecuniary gain;[4] (4) commission of the murders in an especially heinous, cruel or depraved manner;[5] and (5) convictions for multiple murders during the offense.[6]
In response, Correll’s attorney argued that the prosecution had failed to prove, as required by Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), that Correll intended to kill Rosen, Cady, and D’Brito. Although the sentencing court did not accept this argument, Correll’s attorney preserved it for appeal and the Arizona Supreme Court later modified one of Correll’s death sentences to life imprisonment on this ground. See State v. Correll, 148 Ariz. 468, 715 P.2d 721, 730-31 (1986). Correll’s attorney also countered each of the government’s proffered aggravating factors.[7] He argued— *1021 and the sentencing court agreed — that the “grave risk of death to others” aggravating factor did not apply. He also argued that the multiple murder aggravating factor could not be considered. Although the sentencing court did not accept this argument, Correll’s attorney pre-served it for appeal and the Arizona Supreme Court later invalidated this aggravating factor. See id. at 734-35. Correll’s attorney unsuccessfully argued that the evidence did not support the remaining aggravating factors.
In addition to challenging the government’s aggravating factors, Correll’s attorney also pointed to mitigating evidence.[8] In particular, he emphasized that Correll was not the trigger man as to the three people who died and that “John Nabors was the leader.” He noted that “Mr. Na-bors was the one that knew Guy Snelling was a drug dealer, that Guy Snelling would have money and drugs [when] the robbery occurred. So, it’s obvious that John Na-bors did plan the robbery.” He drew the court’s attention to Snelling’s statement that “it appeared to him that John Nabors was the leader, was the one calling the shots, so to speak.” He further noted that, prior to the robbery, Correll could not have reasonably anticipated that anyone would be present in the home other than Guy Snelling. Accordingly, he could not have planned the three deaths.[9]
Correll’s attorney also argued in both his sentencing memorandum and his oral argument that Correll was under the influence of drugs and alcohol at the time of the murders.[10] He specifically drew the sentencing judge’s attention to Snelling’s statement to the police that he smelled alcohol on Correll’s breath during the crimes. Correll’s attorney further argued that “the reason that Mike [Correll] has had problems is the fact that when he was 14 years old, that both of his parents abandoned him and what can be expected when someone is abandoned by their parents at such an early age?” Correll’s attorney also argued that Correll’s age — 24—was mitigating.[11]
Although counsel knew that Correll had received psychological counseling, counsel declined to develop psychological evidence because he believed, based on his conversations with Correll, that the only possible diagnosis was antisocial personality disorder. As counsel explained at the eviden-tiary hearing, he believed that this diagnosis would carry little mitigating weight with the sentencing judge and would, in fact, make it easier for the judge to sentence Correll to death because it would cause him to view Correll as permanently damaged psychologically.[12]
*1022 C
The sentencing judge ultimately found four statutory aggravating circumstances.[13] Determining that the mitigating evidence did not outweigh these factors, the judge sentenced Correll to death on each of the murder counts.[14] The Arizona Supreme Court affirmed Correll’s convictions, with the modifications previously mentioned. It then re-weighed the aggravating and mitigating factors and determined that the death penalty was appropriate. Correll, 715 P.2d at 736.
In his state petition for postconviction relief, Correll alleged that his counsel rendered ineffective assistance at sentencing. He contended that during the month that elapsed between the jury verdict and the sentencing hearing, his attorney met with him for just five minutes. He also contended that his attorney failed to investigate and to develop available evidence relating to his psychiatric history and condition at the time of the crimes. The state trial court summarily dismissed the petition, stating that
[n]o colorable issues relating to ineffective assistance of counsel are raised. In this respect, the Court specifically recalls that the trial work of defense counsel was precise, careful, and competent, and manifested strategic and tactical judgments of the same high quality.
The Arizona Supreme Court denied review without comment.
Correll later filed a federal petition for writ of habeas corpus and the district court entered summary judgment against him. On appeal (“Correll I ”), we held that Correll’s ineffective assistance allegations, which had not been fully explored in state court, entitled him an evidentiary hearing. We held that Correll had established (1) that the state court trier of fact had not conducted a full and fair hearing to find the relevant facts, and (2) that his allegations, if proven, might constitute a color-able ineffective assistance claim. Correll v. Stewart, 137 F.3d 1404, 1411-12 (9th Cir.1998).
D
Pursuant to our instructions on remand, the district court conducted a nine-day evi-dentiary hearing on Correll’s ineffective assistance of counsel claim. Correll, who waived his appearance, called fourteen witnesses. The government called three witnesses. The district court studied reams of documents, including Correll’s attorney’s notes, which were nearly a quarter-century old, and Correll’s childhood medical records, which were two decades older.
Based on the evidence presented at the hearing, the district court rejected Cor-rell’s allegation that his attorney only spent five minutes with him between conviction and sentence. The district court found instead that “[pjrior to sentencing, [counsel] had multiple face-to-face meet *1023 ings and phone calls with Petitioner” in which he “diseuss[ed] with Petitioner the over-all mitigation case and the specific reasons he would present to the court in favor of a life sentence rather than the death penalty.” The district court found that counsel spoke to between 40 and 50 witnesses, including all of Correll’s family members who would cooperate. The district court further found that, unfortunately, “[t]he witnesses were not able to provide relevant useful mitigation information. In fact, in many instances, the witnesses only provided inculpatory and non-mitigating information.”
After outlining all the evidence in a detailed 109-page disposition, the district court found constitutionally deficient performance on two narrow grounds: (1) counsel’s failure to obtain medical treatment records arising out of a head injury that occurred when Correll was seven years old and (2) counsel’s failure to thoroughly review Correll’s mental health records. The court determined that a reasonable attorney would have investigated these matters for possible mitigating evidence rather than relying on his own impression, based on his interaction with the defendant, that the defendant had no intellectual or psychological deficits that could serve as mitigating evidence.
Notwithstanding these errors, the district court found that Correll was not prejudiced by counsel’s ineffectiveness. After postconviction counsel developed all the evidence relating to Correll’s head injury and mental health history, it was clear that there was “a lack of substantial mitigation” available because Correll, in the words of the district court, “is a highly functioning adult” who has never suffered from brain damage or a major psychological disorder. Furthermore, the district court found that much of the. evidence Correll now claims counsel should have put before the sentencing judge would have been counterproductive because, in the words of the district court, it would have “opened the door for the prosecution to come forward with strong damaging rebuttal information to counter its mitigating effect.”
II
As the Supreme Court has made clear, we do not presume prejudice from counsel’s ineffective assistance. Strickland, 466 U.S. at 693, 104 S.Ct. 2052. Once we determine that “counsel’s performance was deficient, [Correll] still bears the highly demanding and heavy burden of establishing actual prejudice.” Allen, 395 F.3d at 1000 (internal quotation marks omitted) (emphasis added). This burden “affirmatively [to] prove prejudice” requires showing more than just the possibility that counsel’s performance prejudiced the outcome. Strickland, 466 U.S. at 693, 104 S.Ct. 2052. Correll must demonstrate “a reasonable probability” that, but for counsel’s constitutionally deficient performance, he would have received a lesser sentence. Id. at 695, 104 S.Ct. 2052. In assessing prejudice, of course, “we are not asked to imagine what the effect of certain testimony would have been upon us personally.” Smith v. Stewart, 140 F.3d 1263, 1270 (9th Cir.1998). We instead must determine what the effect of Correll’s new evidence might have been upon the Arizona sentencing judge at the time of Correll’s sentencing hearing twenty-two years ago.[15] Id.
The majority, in reaching its conclusion that Correll has met his heavy burden to *1024 demonstrate prejudice, ignores the mountain of precedent which provides that we must consider not only the benefits of the ostensibly mitigating evidence counsel failed to present, but also its drawbacks. The Supreme Court has long instructed that we must consider whether the new mitigating evidence, if presented, would have been counterproductive. In Darden v. Wainwright, 477 U.S. 168, 186, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the Supreme Court held that trial counsel’s failure to present any mitigating evidence did not constitute deficient performance because the presentation of such evidence would open the door to damaging rebuttal evidence. Similarly, in Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), the Supreme Court held that psychological records were “by no means uniformly helpful to petitioner because they suggest violent tendencies that are at odds with the defense’s strategy of portraying petitioner’s actions on the night of the murder as the result of [another person’s] strong influence upon his will.” Id. at 793, 107 S.Ct. 3114.
Based on these cases, we have held that an attorney who failed to present psychological testimony relating to the defendant’s antisocial personality disorder was not ineffective because such testimony “would have allowed the prosecution during cross-examination and rebuttal to rehash the horrific details of [the] crimes.” Bonin v. Calderon, 59 F.3d 815, 836 (9th Cir.1995). The Supreme Court, in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), repeatedly emphasized that this line of cases remains in effect. In finding that Wiggins had met his burden to prove prejudice, the Supreme Court noted “Wiggins d[id] not have a record of violent conduct that could have been introduced by the State to offset” the mitigating evidence. Id. at 537, 123 S.Ct. 2527. The Court explained that ‘Wiggins’s history contained little of the double edge” present in other cases. Id. at 535, 123 S.Ct. 2527. It also noted that there was no evidence “suggest[ing] that a mitigation case, in its own right, would have been counterproductive.” Id. at 525, 123 S.Ct. 2527. The majority errs by ignoring the fact that, unlike Wiggins, much of new mitigating evidence Correll argues his attorney should have presented would have enabled the prosecution to present very damaging rebuttal evidence.
The majority compounds this error by substituting its own independent review of the record for that of the district court. Our review of the district court’s factual findings is supposed to be “significantly deferential, in that we must accept the district court’s factual findings absent a definite and firm conviction that a mistake has been committed.” Silva v. Woodford, 279 F.3d 825, 835 (9th Cir.2002) (internal quotation marks omitted). As long as the district court’s account of the evidence “ ‘is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.’ ” Phoenix Engineering and Supply Inc. v. Universal Elec. Co., Inc., 104 F.3d 1137, 1141 (9th Cir.1997) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). Unfortunately, the majority repeatedly flouts this standard of review. As set out below, these errors lead the majority to eviscerate the prejudice standard set out in Wiggins, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471.
Taking the facts as they actually are, not as the majority wishes them to be, it is apparent that Correll failed to carry his burden to demonstrate “a reasonable probability” that, but for counsel’s constitutionally deficient performance, he would have *1025 received a lesser sentence. Strickland, 466 U.S. at 695, 104 S.Ct. 2052.
A
First, counsel’s failure to obtain the medical records relating to Correll’s childhood head injury had virtually no impact on sentencing because these records did not, in fact, demonstrate any brain damage. Based on testimony received from neuropsychologists, the district court found that Correll “did not suffer any brain injury from the block wall that fell on him when he was 7 years old.” The district court credited a neuropsychologist’s testimony “that of all the capital defendants he has tested, Petitioner is one of the highest functioning” and determined that Correll is “a highly functioning adult.”
The medical records from the incident support the district court’s assessment. After the childhood injury, Correll was diagnosed with a subgaleal hematoma, which is a bruise or collection of blood under the scalp, but above the skull. The hematoma cleared in five days, at which time a doctor described the seven-year-old Correll as alert and well. See Smith v. Stewart, 189 F.3d 1004, 1013 n. 4 (9th Cir.1999) (noting that “the absence of [a presentation of] mitigating evidence may be irrelevant when no substantial mitigating evidence is available”). I accordingly cannot agree with the majority’s conclusion that Correll has carried his burden to establish a reasonable possibility that he would have received a lesser sentence if the records relating to his childhood head injury had been before the sentencing judge.
B
Second, Correll’s new psychiatric evidence also would not have significantly helped his ease. The district court found that “there is insufficient evidence to support that Petitioner has ever suffered from any major mental illness, whether PTSD [post traumatic stress disorder], a major depressive disorder, or a bipolar disorder.” The district court reached this factual finding after two psychological experts testified that there was no evidence Correll has ever suffered from these disorders. The sole witness who speculated that Correll might have suffered from post traumatic stress disorder acknowledged that such a diagnosis was “only a possibility.” The district court found Correll’s self-reporting of bipolar disorder and severe depression incredible in light of Correll’s obvious motive to fabricate and in light of the fact that these diagnoses do not appear in his records and Correll indicated that he was never given medication to treat them.
The district court also found that the evidence did not support Cornell's contention that he was given anti-psychotic medications while in custody. In reaching this factual finding, the district court noted that the mental health experts for both parties scrutinized Correll’s medical records from the California Department of Corrections (“CDC”) and reported the absence of any indication that anti-psychotic medication was ever prescribed. Although it appears that Correll was given Mellaril for a period of time as a juvenile, the government’s mental health expert, Dr. John Scialli, M.D., testified without opposition that the dosage — 25 milligrams— would have served as a mild tranquilizer and was far lower than the dosage that would be utilized to counteract psychosis (approximately 625 milligrams).
Accordingly, had Correll’s attorney thoroughly reviewed Correll’s mental health records, he would have only had credible evidence for the diagnosis he already suspected: antisocial personality disorder accompanied by mild depression. As we have previously noted, an antisocial personality disorder diagnosis may be “potentially more harmful to [a] petitioner than *1026 [helpful].” Gerlaugh v. Stewart, 129 F.3d 1027, 1035 (9th Cir.1997). We have “agree[d] with the Arizona Supreme Court that this evidence has obvious countervailing tactical dangers,” because “[i]n its best possible light, it is a basket of cobras.” Id. “Accordingly, [in a prior case,] we c[ould] identify no prejudice flowing from counsel’s failure to develop” psychiatric testimony relating to a defendant’s antisocial personality disorder. Id.; see also Darden, 477 U.S. at 186-87, 106 S.Ct. 2464 (counsel’s decision not to present character or mental-state evidence in mitigation was sound trial strategy because the mitigating evidence would have opened the door to damaging rebuttal evidence, which included a psychiatric opinion that the defendant had a sociopathic personality); Clabourne v. Lewis, 64 F.3d 1373, 1384 (9th Cir.1995) (noting that mental health records omitted from the sentencing hearing “hardly turned out to be helpful” because they indicated that the defendant had “an antisocial personality”); Daniels v. Woodford, 428 F.3d 1181, 1204, 1210 (9th Cir.2005) (indicating that testimony suggesting that a capital defendant is a “sociopath” is aggravating rather than mitigating); Caro v. Woodford, 280 F.3d 1247, 1257 (9th Cir.2002) (concluding that a psychologist’s testimony did not help the defendant’s mitigation case because it tended “to paint him as a violent psychopath”); Beardslee v. Woodford, 358 F.3d 560, 583 (9th Cir.2004) (acknowledging that an antisocial personality diagnosis can be damaging to a capital defendant); Williams v. Calderon, 52 F.3d 1465, 1472 (9th Cir.1995) (“We have no doubt that ... statements [suggesting that the defendant is sociopathic] did nothing to advance Williams’s cause.”).
Furthermore, had Correll’s attorney presented Correll’s mental health records at sentencing, he would have opened the door for the prosecution to present extremely damaging rebuttal evidence that would have likely eviscerated the minimal mitigating impact these records carried. The district court found that, had Correll’s attorney presented mental health evidence, the “highly skilled” prosecutor would have presented the following evidence that was not already before the sentencing judge:
(i) Petitioner’s rape of a female psychotic patient while he was undergoing mental health treatment for his antisocial personality disorder and mild depression; (ii) Petitioner’s numerous escapes from mental health treatment facilities and rejections of institutional efforts to provide him with mental health treatment; (iii) Petitioner’s hostage taking and armed aggression against mental health workers in an escape attempt from a mental health treatment facility; (iv) the underlying factual basis of Petitioner’s prior convictions for armed robbery; ... (viii) the conclusion of a social evaluation at age 18 that Petitioner was not a candidate for probation and was a danger to the community; (ix) additional information showing the efforts of Petitioner’s parents to deal with his drug abuse problem and obtain psychological treatment for him following his armed threat against a teacher at school; (x) that Petitioner had no desire to work but only wished to enjoy himself; and (xi) Petitioner’s statement that when he committed the 1978 armed robberies that it gave him a strong sense of power and excitement.
The district court “credit[ed counsel’s] testimony that the prosecutor, Sidney Davis, had a reputation for excellent preparation and that she would have left no stone unturned in her opportunity to rebut any mitigation evidence presented.”
Additionally, presentation of Correll’s antisocial personality disorder at sentencing would have severely undermined counsel’s strategy of arguing that Correll merely followed Nabors’s lead during the *1027 crimes. The antisocial personality diagnosis would have almost certainly prompted the government to point out that Correll, at age 18, was the instigator of an armed robbery in which he enlisted the assistance of his 13-year-old brother and 15-year old girlfriend. See Bonin, 59 F.3d at 836 (finding that the failure to present expert psychological testimony was not prejudicial because it “would have distracted jurors from [counsel’s main mitigation] theory and [other] mitigation evidence, reduced [the defendant’s] credibility with the jury, and opened the door to powerful cross-examination and rebuttal”); Burger, 483 U.S. at 793, 107 S.Ct. 3114 (holding that a petitioner failed to prove ineffective assistance where the affidavits detailing the defendant’s behavioral history his attorney failed to present “are by no means uniformly helpful to petitioner because they suggest violent tendencies that are at odds with the defense’s strategy of portraying petitioner’s actions on the night of the murder as the result of[another person’s] strong influence upon his will”).
In sum, the psychological evidence, if presented, would have demonstrated only that Correll has an antisocial personality with mild depression. Evidence of an antisocial personality would have had tremendous potential to be more harmful than helpful. In addition, this evidence would have opened the door for the prosecution to introduce a laundry list of extremely damaging information not already before the sentencing judge and would have crippled Correll’s chances of convincing the sentencing judge that he was merely following Nabors’s lead during the crimes.[16] Accordingly, contrary to the majority’s conclusion, Correll cannot prove a reasonable probability that he would have received a lesser sentence if the available psychological evidence had been before the sentencing judge.
C
As to Correll’s drug use, the district court found that there was no evidence— other than Correll’s self-serving statements' — that Correll was significantly impaired at the time of the crimes. Arizona law at the time provided that “[a] defendant’s intoxication or alcoholism at the time of the offense is a mitigating circumstance if the evidence shows that it significantly impaired the defendant’s capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.” State v. Zaragoza, 135 Ariz. 63, 659 P.2d 22, 30 (1983) (emphasis added). The district court found that Cor-rell’s behavior during the murders indicated he was not intoxicated:
[I]t was Petitioner who remained calm when the gun misfired as Nabors was trying to kill Robin Cady. It was Petitioner who encouraged Nabors to remain calm as there were no cars coming, to get a shell chambered and shoot Cady. Such behavior at the time of the crime does not demonstrate intoxication *1028 and, in fact, undercuts an assertion of intoxication.
See Williams v. Woodford, 384 F.3d 567, 624 (9th Cir.2004) (reasoning that there is little basis for believing that drugs materially affected the defendant’s behavior at the time of the crimes when the facts of the crimes reflect deliberate and methodical action).
No witnesses could have testified that Correll was intoxicated during the crimes and only one witness, Correll’s sister, could have testified that Correll used methamphetamine in the morning of the day prior to the crime. Correll was not prejudiced by his sister’s failure to testify, however, because her testimony, on cross-examination, would have eviscerated any remaining residual doubt in the sentencing judge’s mind as to Correll’s guilt. As the district court found, her “testimony would have totally eliminated any mitigating weight from Petitioner’s claim of innocence and residual doubt (i.e., the guilt phase misidentification defense).” She knew Correll was with Nabors when the crimes occurred and that they had sought a ride out of the state very soon after the murders occurred. See Allen, 395 F.3d at 1004 (explaining that “mitigation witnesses proffered by [the defendant] would not have proved helpful given their own involvement in [the defendant’s criminal enterprise.”); Williams v. Woodford, 384 F.3d 567, 624 (9th Cir.2004) (“[T]he best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt.”).
The only other witness Correll’s post-conviction counsel presented relating to drug use was Dawn Day, who testified that she used methamphetamine with Correll during a four month period from November 1982 until February 1983. We cannot consider Day’s testimony, however, because Correll failed to establish that Day was available to testify at his sentencing hearing. See Douglas, 316 F.3d at 1086 n. 2 (explaining that testimony presented at a district court evidentiary hearing that was not available to counsel at the sentencing hearing may not be considered for prejudice purposes). Furthermore, even had Correll established that Day would been available, Day’s testimony that Correll used methamphetamine more than a year before the crime would have provided little support for an argument that Correll, at the time of the crime, was so impaired that he was unable “to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.” Zaragoza, 659 P.2d at 30.
Finally, the district court reasonably declined to credit Correll’s two drug abuse experts’ opinions on the effects of severe methamphetamine addiction because these opinions were not based on an examination of Correll but instead were based on a hypothetical set of facts provided by Cor-rell’s postconviction counsel. As the district court explained:
Dr. Sullivan did not examine Petitioner nor did he look at Petitioner’s Arizona Department of Corrections or CDOC records. Rather, Dr. Sullivan was asked to assume [a set of] hypothetical facts[that] do not accurately or reliably portray Petitioner’s alleged drug abuse.... [H]is opinion was based on unsubstantiated and unreliable assumptions.
In stark contract to the hypothetical assumptions on which Dr. Sullivan’s opinion was based, the district court found that Correll was incarcerated, except for 229 days, during the nine year period between October 1975 (when Correll was first incarcerated, at age 14) and March 1984 (the month before the crime) and that “Peti *1029 tioner was not a methamphetamine addict or a long-term abuser of methamphetamine during the time he was incarcerated.” The district court further explained:
The Court does not credit Petitioner’s unsubstantiated self-report that he abused methamphetamine every day before the crimes were committed. Petitioner chose not to testify at the eviden-tiary hearing; Petitioner chose not to fully cooperate with [the government’s drug abuse expert’s] examination of Mm regarding the issue of drug abuse. Because of the obvious motive to fabricate, Petitioner’s self-serving statements about his drug usage prior to the crimes is [sic] unreliable and subject to searching skepticism. See, e.g., [State v.] Medrano, [185 Ariz. 192] 914 P.2d [225] 227 [(Ariz.1996) (“the defendant provided most of the information concerning his use of cocaine in the past and on the night of the murder, as well as the drug’s effect on him. Because of the obvious motive to fabricate, such self-serving testimony is subject to skepticism and may be deemed insufficient to establish mitigation.”) ]; see also Bernard Smith [v. Stewart ], 140 F.3d [1263,] 1270 [1998] (evaluating evidence based on impartial sentencing judge applying Arizona law); see generally, Strickland, 466 U.S. at 695, 104 S.Ct. 2052 (“The assessment of prejudice should proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision.”). The Court’s searching skepticism toward Petitioner’s self report is corroborated by Respondent’s drug abuse expert, Dr. Matthews, who opined as follows: “Antisocial personality disorder is characterized by malingering and deceit; instances of [Petitioner’s] lifelong pattern of deceptiveness abound throughout his penal and other records. He has been deceitful about a great many matters, including his history of substance abuse. Because of [Petitioner’s] history of deceit, it is a major clinical error to accept [Petitioner’s] self-serving view of his condition at the time of the offense as accurate.”
Furthermore, Correll’s other expert witness on drug addiction, Dr. Shaw, whom the majority quotes for the proposition that Correll “may have been experiencing drug-induced paranoia” at the time of the murders, Maj. Op. at 1015, was “thoroughly impeached” at the evidentiary hearing. As the district court explained, “Dr. Shaw admitted that he only minimally considered the facts of the crime before reaching his conclusion.” The district court found Dr. Shaw’s opinion “entirely not credible and wholly speculative” because it, like Dr. Sullivan’s opinion, was “based upon hypothetical drug usage at the time of the crimes that was not established.”
Based on the foregoing, I agree with the district court that, under the facts of this case, counsel’s failure to present evidence regarding Correll’s drug use — other than counsel’s statement that Correll had been using alcohol and drugs and Snelling’s statement that he smelled alcohol on his captor’s breath- — was not prejudicial. I agree with the district court’s conclusion that if Correll’s attorney had called an expert to testify, “it is highly likely any lay witness basis for the expert’s opinion could have been cross-examined at sentencing and impeached by virtue of the fact that no lay witness could testify that Petitioner was intoxicated at the time of the crimes.” I also credit the district court’s observation that “if an expert had testified based solely on Petitioner’s self-reporting ... it is very likely that the expert’s opinion would have been severely undermined by undisputed evidence that Petitioner had spent almost 9 of the last 10 years incar *1030 cerated with little or no access to drugs.”[17] I accordingly cannot agree with majority’s conclusion that Correll has met his burden to prove that, had counsel presented more detailed evidence about his drug use, he would have received a lesser sentence.
D
Finally, Correll has presented no credible evidence about his childhood that his attorney could have placed before the sentencing judge other than the evidence the sentencing judge already had before him. The district court, who is in the best position to determine credibility, found Cor-rell’s uncorroborated allegation that his mother banged his head against a kitchen table incredible. In regard to the head injury Correll suffered at age seven when a cinder block wall fell on him, the district court expressly found that Correll’s parents were not negligent in securing medical care. Based on the medical records presented at the evidentiary hearing, the district court found that Correll’s parents took him to the family doctor the day the accident occurred and “acted reasonably in caring for Petitioner, which included two visits to their family doctor, one emergency room visit and a follow-up visit for additional specialized testing.”
The remaining family history evidence the majority cites comes from Reverend Curry, whom the district court found “was not an available witness” for counsel at the time of the sentencing hearing. The district court found “that if [Reverend Curry] had been contacted by [counsel] prior to sentencing, he would have informed him that he would not discuss information about Petitioner or appear at sentencing because it was against California law for him to discuss former residents of the CYA.”[18] Accordingly, Reverend Curry’s testimony cannot factor into the prejudice analysis. See Douglas, 316 F.3d at 1086 (explaining that testimony presented at a district court evidentiary hearing that was not available to counsel at the sentencing hearing may not be considered for prejudice purposes).
The district court further found that had counsel emphasized Cornell's parents’ use of corporal punishment, the prosecution would have countered with evidence that Correll’s parents took him to a private psychologist and participated in a six-month treatment program with him after he was expelled from eighth grade for threatening a teacher with a knife. The prosecution likely also would have presented evidence that Correll had repeatedly molested his sister. Accordingly, on bal- *1031 anee, presentation of family history evidence would have been counterproductive. I cannot agree with the majority’s conclusion that Correll has met his burden to prove that, had counsel presented more detailed evidence about his childhood, he would have received a lesser sentence.
Ill
The sum of the majority’s analysis in this case simply eviscerates the requirement that a habeas petitioner prove prejudice in order to prevail on a claim for ineffective assistance of counsel. Not satisfied with merely reconstructing the facts, the majority also reinvents Supreme Court authority, asserting that the mitigating evidence in this case “is clearly sufficient to establish prejudice under the Supreme Court’s standard in Wiggins, 539 U.S. at 534-38, 123 S.Ct. 2527.” Maj. Op. at 1015. This statement, of course, is patently absurd, as even a cursory review of the facts in Wiggins reveals that Correll fell drastically short of carrying the demanding burden of proving actual prejudice the Supreme Court found sufficient in that case.
In Wiggins, the petitioner “experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother,” suffered “physical torment, sexual molestation, and repeated rape” during his subsequent years in foster care, and spent time homeless. Id. at 512, 123 S.Ct. 2527. Perhaps most crucial, the petitioner in Wiggins was mentally retarded. Id.
Correll’s new evidence, which reveals that he is “a highly functioning adult,” comes nowhere close to the “powerful mitigating narrative” present in Wiggins. Id. at 513, 123 S.Ct. 2527. In fact, the district judge, who is in the best position to evaluate the evidence, concluded that, when one considers both the positive and negative repercussions of Correll’s new evidence, the balance of aggravation and mitigation “has barely been altered.” By holding that the mitigating evidence in this case is clearly sufficient to establish prejudice under Wiggins, the majority essentially writes the prejudice requirement out of our circuit jurisprudence.
I respectfully dissent.

. Although it is normally not necessary to restate the facts and procedural history in a dissenting opinion, the reader will understand that this exercise is necessary due to the sharp divergence between the majority’s presentation of the facts and the district court’s factual findings.

. Ariz.Rev.Stat. § 13-703(F)(2).

. Ariz.Rev.Stat. § 13-703(F)(3).

. Ariz.Rev.Stat. § 13-703(F)(5).

. Ariz.Rev.Stat. § 13 — 703(F)(6).

. Ariz.Rev.Stat. § 13 — 703(F)(8).

. The majority unduly discounts defense counsel’s attack of the government's asserted aggravating factors. See Maj. Op. at 1013— 1014. Both the Arizona Supreme Court and the state trial court disagreed with the majority’s assessment of counsel’s performance with respect to the "grave risk of death to others” and the "multiple murders” aggravating factors, agreeing with counsel's assertion that the first factor was unsupported and the second was unconstitutional in this case. The Arizona Supreme Court also found persuasive defense counsel’s argument that the government failed to prove beyond a reasonable doubt that Correll intended to kill one victim and therefore the death penalty could not be imposed on that count. Furthermore, counsel made compelling substantive legal and factual arguments with respect to the other aggravating factors.

. Quoting the state trial court record, the majority asserts that the "Defendant waive[d] presentation of mitigating evidence.” Maj. Op. at 1013; see also id. at 1013. This excerpt, however, was only the conclusion of the court clerk. Indeed, defense counsel adamantly stated that "[w]e didn’t waive” the presentation of mitigating evidence.

. A defendant’s inability reasonably to foresee that his conduct would cause death to another person is a statutory mitigating factor. See Ariz.Rev.Stat. § 13 — 703(G)(4).

. A defendant's inability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law is a statutory mitigating factor. See Ariz.Rev.Stat. § 13-703(G)(1).

. A defendant’s age is a statutory mitigating factor. See Ariz.Rev.Stat. § 13-703(G)(5).

. The district court explained, based on the evidence presented at the sentencing hearing:
Rather than argue Petitioner’s personality disorder to Judge Howe, [counsel] decided that Petitioner had a better chance to avoid the death penalty if he portrayed that Petitioner was involved in a drug ripoff which had gone terribly wrong, that Petitioner had only been a follower in the matter, that he had not been the trigger-man as to the three people who died, that Guy Snelling *1022 had reported to police that Petitioner was under the influence of drugs and/or alcohol at the time of the crimes, and that he should be shown sympathy because his family abandoned him at the age of 14.

. The Supreme Court has since held that Arizona's practice of judges finding aggravating factors violates the Sixth Amendment right to a jury. See Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Ring does not apply, however, to cases such as this one that were already final on direct review. See Schriro v. Summerlin, 542 U.S. 348, 358, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).

. The majority erroneously states that "Arizona law required imposition of the death penalty when no mitigating factors were found.” Maj. Op. at 1019. But, as the majority itself recognizes in the preceding sentence, Arizona law only required the imposition of the death penalty if aggravating factors were proven and no mitigating factors suffi *1023 ciently substantial to call for leniency were found.

. Because Correll’s petition for a writ of habeas corpus was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”), Pub.L. No. 104-132, 110 Stat. 1214, pre-AEDPA law governs our review. Lindh v. Murphy, 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

. The majority concludes that "a significant portion of that damaging rebuttal evidence was already available through the pre-sen-tence report." Maj. Op. at 1018. But, as discussed at length in this dissent, defense counsel realized the introduction of some potentially mitigating evidence would open the door to a parade of horribles. For example, while the pre-sentence report summarily discloses Correll’s conviction of three counts of armed robbery in 1978, defense counsel understandably wanted to preclude damning rebuttal evidence revealing that Correll enlisted his 13-year-old younger brother and his 15-year-old girlfriend in the robbery of the three convenience stores at gunpoint. Furthermore, the pre-sentence report is silent regarding other extremely damaging information that the prosecutor would have surely brought to light in rebutting certain potentially mitigating evidence.

. I would further note that a drug defense likely would have evoked less sympathy from an Arizona sentencing judge 22 years ago than it does from the court today. See Mayfield v. Woodford, 270 F.3d 915, 931 (9th Cir.2001) (crediting testimony that there were "no death penalty cases tried in San Bernar-dino County prior to 1983 where a drug defense had been successful in gaining either an acquittal or in reducing the sentence from death to life without parole.”). The sentencing judge likely would have taken note of the fact that Correll never sought treatment for his substance abuse problem and repeatedly secured his removal from the mental health programs in which he was placed either by escaping or by violently assaulting the staff.

. While the majority quotes Reverend Curry's testimony that he "would have unhesitatingly come to help” Correll, see Maj. Op. at 1011-1012 n. 3, I credit the district court's finding that at the time of the sentencing hearing he was unavailable to help. Reverend Curry testified that he "cannot offer testimony or assertions regarding people who have been in California Youth Authority [because] [i]t is forbidden by law.” Reverend Curry testified that others "may contact me,” but he “could not make contact with” counsel and when he "talked with [his] supervisors about it, ... they said no.” Furthermore, defense counsel testified that when he contacted Reverend Curry's wife, she informed him that the Reverend "didn't really want to be involved.”